William KUREK, Walter Durdle, Robert Togikawa, Edwin Jones, and Richard Hoadley, Plaintiffs-Appellants,

v.

PLEASURE DRIVEWAY AND PARK DISTRICT OF PEORIA, ILLINOIS, an Illinois political subdivision, George L. Luthy, John R. Canterbury, James A. Cummings, Bonnie W. Noble, Clyde West, Harold A. (Pete) Vonachen, Jr., Individually and as President and Members of the Pleasure Driveway and Park District of Peoria, Rhodell E. Owens, Individually and as Director of Parks and Recreation, Jack M. Fuller, Individually and as Administrative Assistant, Daniel B. Ohlemiller, Individually and as Business Administrator, Frank D. Borror, Individually and as Superintendent of Maintenance, William McD. Frederick, Individually and as Attorney of Pleasure Driveway and Park District of Peoria, Golf Shop Management, Inc., an Illinois corporation, and Gordon A. Ramsey, Defendants-Appellees.

No. 76–1791.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1977.

Decided May 26, 1977.

Rehearing and Rehearing En Banc Denied Aug. 11, 1977.

---

582

John E. Cassidy, Jr., Peoria, Ill., for plaintiffs-appellants.

Daniel W. Hardy, Gary S. Clem, Peoria, Ill., William V. Altenberger, Wm. McD. Frederick, Peoria, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and FOREMAN, District Judge.*

PELL, Circuit Judge.

■ The district court dismissed Count I of plaintiffs' complaint (alleging federal antitrust violations and invoking 15 U.S.C. §§ 1, 2, 15 and 26) on the authority of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 81 (1961), and their progeny.[1] Count II of the complaint (alleging deprivations of federal rights under color of state law and invoking 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331(a) and 1343) was dismissed on the grounds that one defendant was not a "person" within the meaning of 42 U.S.C. § 1983 and that the remaining defendants were protected by a previous state court adjudication. This appeal followed.

I

■ We assume, of course, the truth of the well-pleaded facts alleged in plaintiffs' complaint, which are, in material part, as follows: Plaintiffs are five golf professionals, accredited as such by the Professional Golfers' Association. Defendant Pleasure Driveway and Park District of Peoria (the

---

* District Judge James L. Foreman of the Eastern District of Illinois is sitting by designation.

1. In its decision and order dismissing the complaint, the district court also denied plaintiffs' motion for partial summary judgment. The court's determination that no cause of action was alleged *a fortiori* precluded independent consideration of this motion. Although we reach a different conclusion on the sufficiency of plaintiffs' complaint, we see no reason to disturb the district court's denial of partial summary judgment. Plaintiffs did in their briefs cite freely to materials tendered in support of their summary judgment motion and requested reversal of the district court's denial of the motion, but they made no contention at oral argument that they were entitled to summary judgment on this record. Moreover, "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. . . . Trial by affidavit is no substitute for trial by jury . . . ." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (footnote omitted). We do not foreclose the possibility that summary judgment against or in favor of some or all of the defendants may eventually be justified, but we may say with confidence that the present record does not establish that all of the facts material to plaintiffs' complaint are uncontested.

Park District) is a unit of local government within the meaning of Article VII, § 1 of the Illinois Constitution, deriving its powers from various Illinois statutes which will be referred to hereinafter. The Park District owns and operates five municipal golf courses in Peoria, Illinois. Plaintiffs were, for varying periods aggregating 83 years, employed by the Park District to perform combined duties as golf course managers, greenskeepers, and golf professionals at the Park District's courses. Each plaintiff, while so employed, was granted a concession to operate a proprietary retail business (pro shop) selling golfing equipment at his golf course. In this proprietary function each plaintiff competed with each of the others, and between them they constituted the entire public market in Peoria for high quality "pro line" equipment. Eleven individual defendants are and at pertinent times were the President and members of the Park District's Board of Trustees, the Board Attorney, and administrative staff members of the Park District. Also defendants are Golf Shop Management, Inc., the current concessionaire of the pro shops at all five courses, and Gordon Ramsey, the concessionaire's sole incorporator. For present purposes, these last two defendants may be treated together (GSM).

On January 19, 1974, the Park District terminated plaintiffs' concession rights, and on February 20 of that year the Park District terminated plaintiffs' employment. On January 23, 1974, GSM was awarded pro shop concession rights at all of the Park District's five golf courses. The reasons for these events, and the manner in which they came about, are at the heart of this lawsuit.

■ The 1970 Illinois Constitution, Article IX, § 5, provided for the abolition of personal property taxes and authorized the Illinois General Assembly to provide replacement revenue sources for local government units. The General Assembly has not exercised its power to create substitute revenues for local park districts. These facts, which we may and do judicially notice, apparently led the Park District in 1973 to consider the possibilities of obtaining greater revenues from its golf course pro shop concessions.

Plaintiffs had, for some time, been paying small concession fees; each paid only $600 yearly, except for one who was assigned only a nine-hole golf course and who paid only $300. In the late summer and fall of 1973, the terms of the concession agreements for that calendar year were revised in a confusing and apparently less than harmonious series of negotiations, with the result that plaintiffs agreed to pay 1½% of their gross receipts as a fee.

Also during the fall of 1973, GSM and members of the Park District Board and Staff agreed that GSM would make an economically unrealistic "sham" proposal, which would not be performed, to pay $90,000 a year for concession rights at the five golf courses.[2] Public bidding specifications tailored exclusively for GSM's "sham" proposal were designed and advertised, and on December 17, 1973, GSM formalized its $90,000 proposal as a bid. A Park District Board meeting scheduled for December 19 for the purpose of acting on received bids was never held.

Instead, in the language of the complaint,

[f]rom, and after, December 17, 1973, GSM's $90,000 per year proposal . . . was coercively laced with the threat of non-renewal of plaintiffs' 1973 "leases" and summary termination of their proprietary business rights and used to induce them to raise, fix and maintain their retail, rental and service prices and pay a 5% of gross concession or "lease" fee to the PARK DISTRICT.

[The Park District defendants] used the GSM proposal, with GSM agreement, to

---

2. The plaintiffs do not explicitly allege an agreement or an understanding that GSM would not in fact pay an annual fee of $90,000. However, it is alleged that GSM would suffer net operating losses of at least $50,000 if it paid $90,000 yearly concession fees as promised.

Also, the characterization of the proposal as being a "sham" would seem to imply a lack of bona fides insofar as an intent to carry out the terms and conditions of the proposal was concerned.

coerce plaintiffs into a 5% sales taxing and price raising/fixing scheme.

. . . . .

. On January 16, 1974 the PARK BOARD declared that unless plaintiffs agreed to raise their resale, rental and service prices and pay 5% of the gross receipts before 8 a. m., Saturday, January 19, 1974, their proprietary concession rights would be awarded to GSM, Inc.

. . . . .

The plaintiffs and each of them were not summarily terminated from their proprietary business and local governmental employment rights because of the expiration of their 1973 "leases" but because, on January 19, 1974, they refused to be coercively induced into levying unlawful 5% sales tax levies on their business consumers and because they refused to contract, combine or conspire with the effect of raising, fixing and maintaining their proprietary resale, rental and service prices contrary to Illinois and Federal antitrust laws.

The complaint also alleges that plaintiffs, even after their proprietary terminations, remained in possession of the pro shops, that they litigated the Park District's state court forcible entry and detainer suit, and that this assertion of their "rights" was the cause of their employment terminations. The Illinois Appellate Court determined that plaintiffs' defenses in that suit were not germane to the narrow question of their right to possess the pro shops and that plaintiffs' rights of possession ended at the expiration of their concession agreements on December 31, 1973. *Pleasure Driveway and Park District of Peoria v. Kurek*, 27 Ill.App.3d 60, 325 N.E.2d 650 (1975). The Illinois Supreme Court denied leave to appeal. A subsequent state court damages action by the Park District sought redress

for plaintiffs' allegedly wrongful holding over of possession of the pro shops, and a judgment in the Park District's favor in the amount of $127,605 is apparently pending on appeal. .

As a result of the defendants' wrongful conduct, the golfing public of Peoria is alleged to have lost the benefits of competition, suffered increased prices and all of the evils of monopolistic practices without any corresponding governmental or other benefits. Substantial injury to plaintiffs is claimed. Count I (antitrust) seeks declaratory and injunctive relief against all defendants and treble damages from all defendants except the Park District. Count II (civil rights) seeks damages from all defendants except GSM.

## II

We turn to the question of whether Count I of the complaint fails to allege a cause of action under the antitrust laws. The standard we must apply is settled beyond dispute: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). This rule has particular force in this case, where plaintiffs' motion to amend their complaint by adding a third count, which refined their antitrust theories and made some additional factual allegations, was denied by the district judge in a short decision and order.[3]

Before considering the difficult questions which this case requires us to answer, we note briefly several background matters. First, of course, we intimate no views whatsoever on the likelihood that plaintiffs will be able to prove the allegations of the complaint.[4] Also, the district court's judgment

---

3. The district judge characterized plaintiffs' motion as an attempt to relitigate "antitrust and constitutional violations which simply do not exist" and dismissed the possibility that a conspiracy existed as "pure fancy," although a conspiracy is plainly alleged both in the com-

plaint he dismissed and in the amended complaint he denied leave to file.

4. Nor do we consider the question of which, if any, of the asserted components of plaintiffs' damages will prove to be recoverable under the Supreme Court's recent decision in *Brunswick*

rests solely on the conclusion that the involvement of governmental action takes the case outside the scope of the antitrust laws. Without the benefit of a factual record, the district court's views, or briefing by the parties, we decline to address any broader question than that upon which the district court rested its decision.

■ Moreover, this case does not present the question of whether a public agency may grant a monopolistic concession license without violating the antitrust laws, where no more is alleged or proved. Nor does the case simply involve a public agency's attempt to increase operating revenues by increasing concession fees uniformly to its competing concession licensees. The case does involve both of these elements, the defendants urge us to decide the case as if it involved no more, and the district court, in dismissing the case, apparently accepted this characterization of the issues raised. But more than this is alleged by the complaint, which charges that the threat of a monopolistic license to GSM and the demand for uniformly increased fees were used by the defendants as means in a broader conspiracy to coerce plaintiffs into raising and fixing their retail prices and that the award of the GSM license was made to punish plaintiffs for refusing so to be coerced. Acts which may be legal and innocent in themselves, standing alone, lose that character when incorporated into a conspiracy to restrain trade. *See Simpson v. Union Oil Co. of California*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *Poller v. Columbia Broadcasting System, Inc., supra*, 368 U.S. at 468–69, 82 S.Ct. 486.

### III

■ We must initially determine whether the district court correctly stated the law to be that the activities of the Park District are outside the scope of the Sherman Act,

either as a general matter or, at least, in the circumstances of this case. The district court based its conclusion on the "so-called state-action exemption," [5] *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), which was articulated in *Parker v. Brown, supra*, and its progeny.

In *Parker*, the state of California's program for prorating the state's raisin crop so as to reduce excess supply and stabilize prices, which program was found to be consistent with federal agricultural regulations and policy, was questioned as to its validity under the Sherman Act, 15 U.S.C. § 1 et seq. The defendants were some of those charged by law with operating the program. The Supreme Court, assuming that the program would violate the Act if it were implemented by private persons, concluded nonetheless that the Act was not intended to prohibit the prorate program, which

> derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

> The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.

317 U.S. at 350–51, 63 S.Ct. at 313. The anticompetitive effects of California's pro-

---

*Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

**5.** As the opinions of the Supreme Court, considered herein, have recognized, *Parker* announced no rule of antitrust *exemption* or *immunity*; rather, it determined that the Sher-

man Act was not intended to apply in the first place to the type of state-mandated activities there at issue. Other courts nevertheless have utilized the single-word shorthand references of "exemption" or "immunity."

588

rate program derived from "the state['s] command"; the state adopted, organized, and enforced the program "in the execution of a governmental policy." *Id.* at 352, 63 S.Ct. at 314. This fact was repeatedly emphasized by the Court in its brief discussion of the antitrust issue, and in its conclusion: "The state . . ., as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Id.*

*Goldfarb v. Virginia State Bar, supra,* presented the question "whether a minimum fee schedule for lawyers published by the Fairfax County [Virginia] Bar Association and enforced by the Virginia State Bar," 421 U.S. at 775, 95 S.Ct. at 2007, violated § 1 of the Sherman Act, 15 U.S.C. § 1. Because the Virginia State Bar was "a state agency by law," *id.* at 790, 95 S.Ct. 2004, (footnote omitted), the Supreme Court addressed the State Bar's claim, based on *Parker,* that the Sherman Act did not apply to it, and rejected the claim, without dissent. The Virginia legislature had empowered the Supreme Court of Virginia to regulate the practice of law and had authorized a role for the State Bar in that regulation as an administrative agency of the Supreme Court. The state Supreme Court had developed ethical rules for lawyers, and the State Bar was empowered to issue ethical opinions on the application of the rules. Two such opinions were an important part of the State Bar's role in enforcing minimum fee schedules.

An expansive reading of some of the language in *Parker* would have suggested that the Sherman Act could not be applied to the State Bar in these circumstances, but the Supreme Court took a closer look. Because no Virginia statute referred to lawyers' fees and the Supreme Court of Virginia had taken no action requiring the use of and adherence to minimum fee schedules, it could not be said that the anticompetitive effects of minimum fees were "compelled by direction of the State acting as a sover-

eign." *Id.* at 791, 95 S.Ct. at 2015. The State Bar, although it acted within the scope of its general powers, had "voluntarily joined in what [was] essentially a private anticompetitive activity," *id.* at 792, 95 S.Ct. at 2015, and was not executing the mandate of the state. The Court stated that the existence of sovereign compulsion was "[t]he threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe" and there was, thus, no reason to take the matter any further. *Id.* at 790, 95 S.Ct. at 2015.

After the district court dismissed the present lawsuit, the Supreme Court decided *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), which also bears upon the issues in this case. In *Cantor,* an electric utility, regulated by the state of Michigan, operated a program which provided "free" light bulbs to electricity customers, the costs of the program being covered by the utility's general electricity rates. An independent seller of light bulbs charged antitrust violations, and the utility defended on the theory, based on *Parker,* that the light bulb program was included in its rate tariff filed with and approved by the state Public Service Commission and that state law required it to follow the terms of the tariff as long as it was in effect. Six Justices agreed that summary judgment for the utility, based on *Parker,* had been improperly entered.[6]

*Cantor,* of course, did not present the precise question addressed in *Parker* and at issue here, for in *Parker* state officials executing a state program were the defendants while in *Cantor* a private party sought to rely on state law to insulate its conduct from antitrust liability. The considerations applicable to each case are necessarily less than identical. While the Court did not develop a single opinion expressing the views of a majority of its members, *see* note 6 *supra,* a majority did agree that analysis of a private party's state law defense re-

6. Mr. Justice Stevens delivered the Court's opinion, joined in whole by Justices Brennan, White, and Marshall, and in substantial part by

the Chief Justice. *Id.* at 603, 96 S.Ct. 3110; Mr. Justice Blackmun concurred in the result. *Id.* at 605, 96 S.Ct. 3110.

quires consideration of whether it would be fair to subject a party to antitrust liability when he may have been caught between inconsistent commands of his state and federal sovereigns, and of factors akin to those used to determine whether federal agency regulation of a business produces an implied antitrust immunity.

In deciding *Cantor*, the Court majority emphasized the facts that no Michigan statutes purported to regulate the light bulb industry, that neither the Michigan legislature nor the Public Service Commission had ever specifically looked into the question of the desirability of a "free" light bulb program, and that other utilities regulated by the Commission did not have such a program. The Court majority concluded therefrom that the Commission's approval of the utility's program did not "implement any statewide program relating to light bulbs" and that "the State's policy is neutral on the question whether a utility should, or should not, have such a program." 428 U.S. at 585, 96 S.Ct. at 3114. That conclusion was central to the Court's disposition of the case.

Because a private actor's state law defense is at least related to a governmental body's assertion of a "state action" defense, we think the *Cantor* Court's emphasis on the lack in that case of a "statewide program" or a state policy sheds some light on the present case. We also think that *Cantor*, read with *Goldfarb*, provides important general guidance on the question of what it means to find governmental action involved in the facts of an antitrust suit.

*Cantor* and *Goldfarb* demonstrate beyond serious questioning that the Supreme Court is not inclined any longer, if it ever was, to accept superficial and mechanical application of a *Parker*-based "rule" that antitrust inquiry ends upon such a finding of governmental actions or laws being involved. In the years after *Parker* and before *Goldfarb* and *Cantor*, there was a tendency in many of the reported decisions to apply *Parker* broadly and to use rather general language in so doing. For example, addressing the distinct question of whether persons may join together attempting to induce governmental action with anticompetitive effects, *see* part V of this opinion, *infra*, the Supreme Court stated as a building-block proposition that "where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra*, 365 U.S. at 136, 81 S.Ct. at 529. In the same context, this court's opinion in *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 227 (7th Cir. 1975), used similarly broad language. Neither case involved a claim of governmental action violative of the Sherman Act, the facts of both cases were meaningfully different than those presented here, and we have, thus, no occasion to question whether the language used accurately stated the law as applied to those cases. We point out, however, that *Goldfarb* and *Cantor* undercut the validity of any such simple one-sentence "rule" as a general proposition.

 We turn, then, to the instant complaint, and conclude that *Parker* and its progeny do not support the district court's dismissal thereof. The fact that the governmental body sued here is a park district, with substantially less than statewide jurisdiction, has significance. First, it is clear that subordinate units of government—notwithstanding that they derive their powers from a state—are not entitled to all of the federalistic deference that the state would receive. *See, e. g.*, in the area of the Eleventh Amendment to the Constitution, *Edelman v. Jordan*, 415 U.S. 651, 667 n.12, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). More specifically, where there are numerous subordinate units of government of a given type, each of the same status under state law, it is more difficult to say that the actions of any one of them are undertaken pursuant to "the state['s] command," *Parker, supra*, 317 U.S. at 352, 63 S.Ct. 307, or that "[t]he state . . ., as sovereign" imposed any anticompetitive restraints resulting from such actions. *Id. Goldfarb* established that Sherman Act suits against

state agencies may be maintained unless the conduct challenged is "compelled by direction of the State acting as a sovereign," 421 U.S. at 791, 95 S.Ct. at 2015, and the numerosity and potential variety of practices of subordinate units of government may often suggest that "the State's policy is neutral" on any given practice and that there is no "statewide program" which would require the sort of comity-based respect evident in *Parker. See Cantor, supra*, 428 U.S. at 585, 96 S.Ct. 3110.

We surely do not wish to be understood as saying that park districts and other subordinate governmental units may no longer avail themselves of a *Parker* defense to antitrust suits. Rather, we advert to the fact that a subordinate governmental unit's *Parker* claim is less obviously justified than is the same claim made by a state government, and we conclude that antitrust "immunity" in the former case cannot be automatic. Both the Third and the Fifth Circuits have recently so held. *City of Lafayette, Louisiana v. Louisiana Power & Light Company*, 532 F.2d 431 (5th Cir. 1976), *cert. granted*, 430 U.S. 944, 97 S.Ct. 1577, 51 L.Ed.2d 791 (1977) (two cities); *Duke & Company Inc. v. Foerster*, 521 F.2d 1277 (3d Cir. 1975) (three municipal corporations and a county commissioner); and *cf. Hecht v. Pro-Football, Inc.*, 144 U.S.App. D.C. 56, 444 F.2d 931 (1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (unincorporated instrumentality of the District of Columbia).

We realize that in the case of *State of New Mexico v. American Petrofina, Inc.*, 501 F.2d 363, 370 n.15 (9th Cir. 1974), involving antitrust counterclaims against a state and some of its political subdivisions, the Ninth Circuit has held to the contrary. *State of New Mexico* was, however, decided before *Goldfarb* and *Cantor* and we do not believe its holding as to subordinate units of government survives the test of their analysis. We simply see little sense in automatically treating as state mandates the activi-

ties of local governmental units when these activities may vary substantially from unit to unit and may be wholly lacking in any express or implied state authorization or command.

█ We agree with the Third and Fifth Circuits that an adequate state mandate for anticompetitive activities of subordinate governmental units "may be demonstrated by explicit language in state statutes, or may be inferred from the nature of the powers and duties given to a particular government entity." *Duke & Company Inc., supra*, 521 F.2d at 1280; *accord, City of LaFayette, supra*, 532 F.2d at 434–35. The latter case properly notes that "all evidence which might show the scope of legislative intent" should be considered. *Id.* at 435 (footnote omitted).

█ Nothing in the Illinois statutory provisions governing park districts even remotely suggests that Illinois has authorized, let alone compelled, park districts to attempt to enrich themselves by coercing horizontal retail competitors operating under concession licenses to fix retail prices in what would otherwise be plain violation of the Sherman Act. Park districts are, of course, empowered to "construct, equip and maintain . . . golf . . . courses," Ill.Rev.Stat.1975, ch. 105, § 8–10, as well as "necessary facilities pertinent thereto . . . ." *Id.*, § 9.1–1. Power is also given for park districts "to contract in furtherance of any of [their] corporate purposes," *id.*, § 8–1(a), and "to lease real estate," *id.*, § 8–16. We think these provisions fully authorize the Park District to operate pro shops at its golf courses or to make contracts or leases allowing outside parties to operate such shops. If the complaint in this lawsuit alleged no more than that the Park District had substantially reduced relevant competition by operating the shops itself, foreclosing others,[7] or by determining that the "corporate purposes" of the District would be best served by contracting with a single concessionaire for

7. *Ladue Local Lines, Inc. v. Bi-State Development Agency of the Missouri-Illinois Metropolitan District*, 433 F.2d 131 (8th Cir. 1970); and

*Continental Bus System, Inc. v. City of Dallas*, 386 F.Supp. 359 (N.D.Tex.1974), both relied upon by defendants, are cases of this type.

the operation of the shops,[8] the case for a *Parker* defense would be stronger than it is here. That the Park District's conduct concerned its golf courses and involved its statutory powers to contract and/or to lease surely does not convert Illinois' grant of such powers into state authorization or mandate to use them to force private competitors to violate the antitrust laws.

█ This conclusion is strengthened by the complaint's allegations that the Park District, in demanding 5% of gross sales as a concession fee and requiring as a condition of concession renewal that plaintiffs raise and fix their prices, presumably to cover the 5% fee, was effectively attempting to impose on the Peoria golfing public a 5% hidden sales tax that is illegal under Illinois law. We note that the Park District's revenue powers are limited to the levying of various property taxes, Ill.Rev. Stat.1975, ch. 105, § 6–1 et seq., and the charging of fees for the use of District facilities, *id.*, § 8–1(h), and we are aware of no authority that would authorize the Park District effectively to double the sales taxes currently in force in Illinois. If it can be proven that the concession fee's intended incidence would have operated as an illegal sales tax, it would be extremely difficult, if not impossible, to find a state mandate underlying the Park District's alleged conduct.[9] For this reason and the others indicated, we believe the district court improperly dismissed the antitrust claim against the Park District.

## IV

The analysis set out in part III of this opinion applies directly only to the Park District. In *Parker, supra,* and in some cases applying it, however, officials of governmental units were sued, as is the case here, and it has generally and sensibly been held that where the activities of a governmental unit are outside the scope of the antitrust laws, the officials charged with performing those activities enjoy the same protections. *See Parker, supra,* 317 U.S. at 350–51, 63 S.Ct. 307; *E. W. Wiggins Airways, Inc., supra,* 362 F.2d at 56; *Murdock v. City of Jacksonville, Florida, supra,* 361 F.Supp. at 1093–94. Even in such cases, however, it has sometimes been recognized that an official's actions ultra vires or in bad faith might present a different question. *Id.*

Neither in the district court nor in this court have the individual defendants associated with the Park District made any argument that they should be entitled to protection from antitrust liability even if the District was not. We see no *a priori* reason to determine, at this stage in the litigation, that such additional protection would or would not be justified. *See Duke & Company Inc., supra,* where the Third Circuit reversed a dismissal in favor of three municipal corporations *and* a county commissioner after determining that *Parker* did not protect the governmental unit defendants. Accordingly, we reverse the district court's judgment in favor of the individual Park District defendants. We do not mean to imply thereby that some or all of these defendants may not be able to establish some sort of good faith defense, for neither facts nor legal argument in support of such a defense are before us. Nor do we suggest, even if some sort of good faith defense might be cognizable in appropriate cases, that proof in support of the complaint's allegations of bad faith and official actions illegal under state law might not operate to vitiate the defense in this case.

---

8. *E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52 (1st Cir. 1966), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226, and *Murdock v. City of Jacksonville, Florida,* 361 F.Supp. 1083 (M.D.Fla. 1973), fall into this category, and *Metro Cable Co., supra,* while distinguishable, is analogous. Although these cases and those cited in n. 7 *supra* were all decided before *Goldfarb* and

*Cantor,* we may assume without deciding that the Sherman Act does not apply to these types of less-than-statewide governmental action.

9. Such proof, of course, would add nothing directly to the merits of plaintiffs' antitrust claims and would be germane only to the question of state mandate.

592

V

■ We turn to GSM's contention, accepted by the district court, that its involvement with the facts of this case was limited to seeking the award of a governmental contract and accepting its benefits and obligations once awarded, and that the doctrine of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* and its progeny, protects GSM from antitrust liability. In *Noerr,* the Supreme Court held that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." 365 U.S. at 135, 81 S.Ct. at 528. Three reasons for this rule were articulated. First, the Court found no Congressional purpose to regulate "political activity," and noted that an "essential dissimilarity between an agreement jointly to seek legislation or law enforcement and the agreements traditionally condemned by § 1 of the Act" counseled against construing the Act to apply to the former case. *Id.,* at 136–37, 81 S.Ct. at 529. Second, antitrust liability in such a case could reduce the flow of information on which governments depend and could, thus, impair their ability to take actions that operate to restrain competition, which ability was recognized in *Parker, supra. Id.* at 137, 81 S.Ct. 523. Third, "such a construction of the Sherman Act would raise important constitutional questions" because it would impute to Congress an intent to invade the First Amendment right of petition. *Id.* at 138, 81 S.Ct. at 530. The Court recognized that Sherman Act liability might be justified where conduct "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . ." *Id.* at 144, 81 S.Ct. at 533. Because the *Noerr* defendants were "making a genuine effort to influence legislation and law enforcement practices," *id.,* no such argument was possible in that case.

*Noerr* was followed in *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), where joint labor-management inducements to the Secretary of Labor and the Tennessee Valley Authority to take action injurious to small coal operators were involved. The Court stated that

[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

*Id.* at 670, 85 S.Ct. at 1593.

In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court extended the *Noerr-Pennington* rule to attempts to influence administrative agencies and judicial proceedings. Because, however, the motor carrier defendants used universal resistance to competitors' applications for new operating authority to achieve their primary purpose of deterring the making of such applications, thereby injuring competitors not through governmental action but directly, the case was held to fall within Noerr's "sham" exception.

■ The district court accepted GSM's argument that its role in the case was solely that of the successful bidder for the Park District's pro shop concessions. We may assume arguendo that if the complaint alleged no more, GSM could not be found liable under the antitrust laws. We are inclined to the view that nonliability in such a case would flow from the fact that successful bidding does not violate the antitrust laws substantively, *cf. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975), rather than from the principles of *Noerr,* which seem to address a different question.[10] Perhaps more to the

10. *See Hecht v. Pro-Football, Inc., supra,* 444 F.2d at 940–42; and *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25, 32–34 (1st Cir. 1970), *cert. denied,* 400 U.S. 850,

91 S.Ct. 54, 27 L.Ed.2d 88, both of which take the position that the rationale of *Noerr* and progeny is directed to attempts to influence some significant governmental policy determi-

point would be the decision of this court in *Metro Cable Co. v. CATV of Rockford, Inc., supra*, substantially relied upon by GSM, where defendant obtained the first granted cable television license in a city and successfully induced the city council not to license a potential competitor; this court found that *Noerr* and its progeny foreclosed antitrust liability.

 Neither the successful bidder hypothetical nor *Metro Cable*, however, involve what is alleged here. The complaint asserts that GSM made an economically unrealistic "sham" proposal, not actually to be put into effect, in concert with at least some Park District officials, knowing that the proposal would not be acted upon as indicated in the bid invitation but would, instead, be used by the Park District to coerce plaintiffs into conduct violative of the antitrust laws. If these allegations can be proved, and we must assume at this point that they can, the *Noerr* doctrine would provide no defense. This is so for several reasons.

First, except for the fact that GSM's agreement and conduct were in conjunction with governmental officials it cannot be said that there is an "essential dissimilarity" of the sort that troubled the Court in *Noerr*, 365 U.S. at 136–37, 81 S.Ct. 523, between GSM's conduct and activities traditionally held violative of the Sherman Act. *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), is illustrative.

In *Albrecht*, the defendant newspaper publisher had attempted to coerce plaintiff, one of its independent home delivery carriers, into compliance with a resale price fixing scheme violative of the Sherman Act. Defendant had argued, *inter alia*, that its actions, which included termination of the carrier, were wholly unilateral and did not establish any conspiracy or combination

within the meaning of the Act. The Supreme Court disagreed, and overturned a jury verdict in defendant's favor because it was "clear that a combination in restraint of trade existed." *Id.* at 154, 88 S.Ct. at 874. The only combination presented by the record and considered by the Court is quite like that which, as pertinent to GSM, is alleged here. Specifically, to put pressure on the plaintiff carrier, the defendant hired a subscription solicitation company to seek customers from plaintiff's delivery route for a new route. Twenty-five percent of plaintiff's customers agreed to switch carriers. The defendant then gave these customers to another carrier who knew that he would have to follow defendant's resale price policies and that he might have to return the customers to plaintiff if plaintiff acceded to the policies. The defendant's combination with the solicitation company and the new carrier who lent their business efforts to defendant's attempts to coerce the plaintiff into an antitrust violation supported Sherman Act liability.[11] The parallel to this case is obvious, as is the conclusion that GSM's alleged conduct is not essentially dissimilar to activities the Sherman Act was meant to proscribe.

Nor is the fact that GSM combined or conspired with governmental officials dispositive, for both of *Noerr*'s premises with respect to that point are undercut by the factual setting of this case. Our determination that the Park District and its officials had no state mandate or authority to engage in the activities attacked here necessarily reduces the applicability of the reasoning of *Noerr* to the degree it is based on the need of governmental units for citizen input in making decisions that *Parker* holds to be outside the scope of the Sherman Act. *See Duke & Company Inc., supra*, 521 F.2d at 1282. The *Noerr* decision also rests on a refusal to impute to Congress an intent to

nation and not a government's actions as a commercial entity.

11. Of course, only the newspaper publisher was sued in *Albrecht*, and it is at least possible that had the solicitation company and the new carrier been sued a defense based on their "insubstantial . . . connection with the

restraint" might have been established. *See Goldfarb, supra*, 421 U.S. at 791 n. 21, 95 S.Ct. 2004. On the present complaint, there is no occasion for us to decide if such a defense might be developed in subsequent proceedings here.

invade the constitutional "right of the people . . . to petition the Government *for a redress of grievances*." U.S.Const., Amendment I (emphasis added). We have some difficulty understanding how a contract proposal to a governmental unit falls within the ambit of that right, *see* note 10 *supra*, but even if it does, we think it clear that agreement with government officials to pressure others into an antitrust violation does not.

 Alternatively, another basis for finding *Noerr* protections inapplicable at this stage of the proceedings is that facts provable under the complaint could well establish that GSM's concession proposal was a "mere sham" within the meaning of that decision. 365 U.S. at 144, 81 S.Ct. 523. We are not prepared to say that this conclusion would inexorably follow upon the sole proof that the proposal was economically unrealistic, *see Noerr, supra*, 365 U.S. at 140–42, 81 S.Ct. 523; *Metro Cable, supra*, 516 F.2d at 231; *but see Woods Exploration & Producing Company, Inc. v. Aluminum Company of America*, 438 F.2d 1286, 1296–98 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), but the economically unrealistic nature of the proposal, alleged to have been known to Park District officials, might support an inference that GSM was not "making a genuine effort," *Noerr, supra*, 365 U.S. at 144, 81 S.Ct. 523, to obtain the concession rights but was instead lending its support to the Park District's attempted coercion of plaintiffs' pricing policies. The complaint is somewhat inconsistent in this regard, alleging as it does both that GSM's purpose was to obtain monopolistic concession rights and that GSM knowingly made its proposal to pressure plaintiffs into agreements which, if made, would have foreclosed the concession rights to GSM. Proof of the latter assertion, however, could establish a sham and take the case out of the *Noerr* doctrine

even if that doctrine applied, which we have decided it does not.[12]

## VI

 Count II of the complaint alleges deprivations of the plaintiffs' civil rights under color of state law and is based on 42 U.S.C. § 1983. The district court dismissed Count II because, in its view, previous state court decisions based on the same operative facts had resolved dispositive facts adversely to plaintiffs. On appeal, plaintiffs attack this dismissal only with respect to the complaint's charge that plaintiffs were summarily terminated from their public employment positions because they asserted their rights of petition and to due process by litigating their defenses to the Park District's forcible entry and detainer action. Moreover, plaintiffs agree that the Park District was properly dismissed out as a defendant even as to this charge. Accordingly, we affirm the district court's judgment insofar as it dismisses the other allegations in Count II and dismisses the Park District as a Count II defendant.

With regard to the employment termination claim against the President, trustees, attorney, and staff of the Park District, we must reverse. The district court based its dismissal of this claim on the following finding of Illinois Circuit Court Judge Iben in the Park District's damages lawsuit against the golf professionals:

[T]he reason for their termination clearly appears to have been the Defendant's [sic] [plaintiffs herein] insistence on remaining in the golf shop premises. There is abundant evidence that they stubbornly and intractably insisted through litigation, and other ways, on this claim, spurning other avenues. They can have no doubt about the reason for their discharge, i. e., their refusal to give up the premises.

*Pleasure Driveway and Park District of Peoria v. Kurek et al.*, No. 75 L 2893 (10th

---

12. Defendants' suggestion that the "sham" exception operates only in a judicial setting is specious. The Supreme Court articulated the exception in the context of the *Noerr* facts, which in no way involved judicial settings.

Nor does this court's determination in *Metro Cable, supra*, 516 F.2d at 228, that the existence of a judicial setting authorizes a somewhat broader inquiry into the "sham" issue even remotely support such a proposition.

Judicial Circuit, Peoria County, Nov. 14, 1975). This finding was made with reference to the golf professionals' counterclaim allegation that their employments were summarily and unlawfully terminated.

We have no quarrel with the proposition that if Judge Iben's finding had disposed of the claim made here or had determined adversely to plaintiffs a fact critical to success on this claim, relitigation in the federal courts would be barred. *See Reich v. City of Freeport*, 527 F.2d 666 (7th Cir. 1975); *Phillips v. Shannon*, 445 F.2d 460 (7th Cir. 1971). The fact that the remaining defendants under Count II were not parties or privies in the state court suit would, of course, make the doctrine of res judicata inapplicable, but it would not preclude defendants' defensive reliance on collateral estoppel. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

Nor would it matter that Judge Iben's decision has apparently been appealed,[13] for

> the federal rule is that the pendency of an appeal does not suspend the operation of an otherwise final judgment as . . . collateral estoppel, unless the appeal removes the entire case to the appellate court and constitutes a proceeding de novo.

1B Moore's Federal Practice ¶ 0.416[3], at 2254 (2d ed. 1974); *Grantham v. McGraw-Edison Company*, 444 F.2d 210, 217 (7th Cir. 1971). Illinois follows the same rule. *Sixty-Third & Halsted Realty Co. v. Goldblatt Bros.*, 342 Ill.App. 389, 96 N.E.2d 838 (1951), *aff'd*, 410 Ill. 468, 102 N.E.2d 749.

We do not agree with the district court, however, that Judge Iben's finding disposed of plaintiffs' claim herein or of critical facts pertinent to it. Illinois' Forcible Entry and Detainer Act, Ill.Rev.Stat.1975, ch. 57, § 1 et seq., plainly gives a tenant the right to remain in possession of property while litigating the question of his possessory rights.

Judge Iben's determination that plaintiffs were terminated in their employments because they insisted on remaining in possession of the pro shops implies, to some extent at least, that the employment terminations occurred because plaintiffs chose to litigate their rights to possession. In fact, the finding expressly refers to plaintiffs' insistence "through litigation, and other ways" on asserting their claims to possession. Nothing in this state court judgment supports the district court's conclusion that it had been previously adjudicated that "the exercise of the right to litigate issues" was not the reason for plaintiffs' employment discharges. No other issues pertinent to Count II of the complaint were decided below or asserted in this court, so we reverse the district court's judgment of dismissal insofar as it concerns the employment discharge claim against the individual Park District defendants.

For the reasons stated herein, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Plaintiffs have requested that the provisions of Circuit Rule 18 be applied on remand. We believe that the interests of justice would best be served, in the circumstances of this case, by granting that request. It is so ordered.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

---

**13.** Our record does not reflect the pendency of an appeal in the state court case, but the brief of the defendants who seek to rely on the state judgment represents this to be the case, and we take that representation as a judicial admission of the fact.