**STAR LINES, LTD., Plaintiff,**

v.

**PUERTO RICO MARITIME SHIPPING AUTHORITY and Pacific Far East Lines, Inc., Defendants.**

**No. 77 Civ. 1968 (RLC).**

United States District Court,
S. D. New York.

May 3, 1978.

See also, D.C., 442 F.Supp. 1201.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, Eliot Lauer, New York City, of counsel, for plaintiff.

Austrian, Lance & Stewart, P. C., New York City, Galland, Kharasch, Calkins & Short, Washington, D. C., Peabody, Rivlin, Lambert & Meyers, Washington, D. C., William Klein II, Sandra Gale Behrle, New York City, Amy Loeserman Klein, William Karas, Lewis A. Rivlin, John T. Schell, Washington, D. C., of counsel, for defendant, Puerto Rico Maritime Shipping Authority.

ROBERT L. CARTER, District Judge.

OPINION

Star Lines, Ltd. ("Star Lines") commenced this action against Puerto Rico Maritime Shipping Authority ("PRMSA") and Pacific Far East Lines ("PFEL"), alleging, insofar as is relevant to the instant motion, that the defendants violated §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).[1] Star Lines seeks to recover treble damages under § 4 of the Clayton Act (15 U.S.C. § 15). PRMSA now moves for summary judgment[2] on the grounds that (1) plaintiff lacks standing to raise the issue of PRMSA's antitrust violations; and (2) PRMSA's status as a governmental entity

---

1. The last two counts of the complaint relate only to PFEL and charge tortious interference with Star Lines' contractual relations and business defamation.

2. PRMSA's motion was, in fact, termed a motion to dismiss and made pursuant to Rule 12(b), F.R.Civ.P. However, since the motion papers referred to matters outside the pleadings, both the court and the parties have treated the motion as one for summary judgment pursuant to Rule 56, F.R.Civ.P. *See Gordon v. New York Stock Exchange, Inc.,* 498 F.2d 1303, 1305 n. 6 (2d Cir. 1974), *aff'd,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); F.R.Civ.P. 12(b).

acting pursuant to the specific authority granted it by the Puerto Rico Legislature immunizes it from liability under the antitrust laws. For the reasons set out below, defendant's motion is denied.

*Facts*

The facts underlying the present dispute were set out in an earlier opinion of this court, denying PRMSA's motion to transfer pursuant to 28 U.S.C. §§ 1404, 1406, *Star Lines, Ltd. v. Puerto Rico Maritime Shipping Authority*, 442 F.Supp. 1201 (S.D.N.Y. 1978), and familiarity is assumed. Accordingly, only those facts which are necessary for purposes of determining the instant motion will be set forth.

"PRMSA is both a public agency and a non-stock profit making corporation created, owned, and controlled by the Commonwealth of Puerto Rico."[3] PRMSA's purpose and powers are " 'to own and regulate all aspects of commercial freight shipping in and out of the island from the Eastern and Gulf ports of the mainland as a public service.' "[4] In order to carry out its designated function, "PRMSA acquired control over privately owned marine transportation facilities in Puerto Rico and some twelve cargo ships."[5] One of these ships, the S.S. Puerto Rico, constitutes an essential element of the dispute underlying this action.

The S.S. Puerto Rico is a modern "roll-on roll-off" vessel in which the cargo is transported by means of trailers which are driven on and off the ship. On May 18, 1976, PRMSA entered into an agency contract with Star Lines with respect to the S.S. Puerto Rico. "Under the terms of the contract, Star Lines was to be the agent of PRMSA for purposes of servicing and booking cargo for the S.S. Puerto Rico on its East Coast-Persian Gulf runs."[6] The S.S. Puerto Rico was thereafter used exclusively in the East Coast-Persian Gulf service.

The events which led to the present lawsuit were summarized in our earlier opinion:

"Early in 1977, the agency agreement broke down. On January 4, Star Lines apparently tried to assign its right under the agreement to Pacific Far East Lines ('PFEL'), co-defendant in this action, subject to the approval of PRMSA; but PRMSA did not approve. Instead, on February 15, it gave notice of termination of the agreement to Star Lines and, two days later, gave Star Lines a first refusal offer to subcharter the S.S. Puerto Rico. The next day, Star Lines rejected the subcharter offer on the proffered terms, and also expressed its disagreement with PRMSA as to what date the termination would become effective. At about this time, PRMSA chartered the S.S. Puerto Rico to PFEL, purportedly on the same terms it offered to Star Lines on February 17."[7]

*Allegations of the Amended Complaint*

Star Lines alleges in its amended complaint that PFEL operated the only two roll-on roll-off vessels in the East Coast-Persian Gulf trade other than the S.S. Puerto Rico, and that it was PFEL's "only competitor in the service" of these vessels.[8] Star Lines alleges further that PRMSA and PFEL combined and conspired to enter into a contract that would have the effect of "eliminat[ing] Star Lines as a competitor" in the service of these vessels in the East Coast-Persian Gulf trade.[9] This alleged anticompetitive conduct by defendant PRMSA included, but was not limited to, PRMSA unlawfully terminating Star Lines as its agent and unlawfully breaching its covenant not to provide service, directly or indirectly, between the East Coast and the

---

3. *Star Lines, Ltd. v. Puerto Rico Maritime Shipping Authority*, 442 F.Supp. 1201, 1203 (S.D.N. Y.1978).

4. *Ibid.,* quoting Affidavit of Roberto Lugo D'Acosta, Executive Director of PRMSA, I.A.

5. *Id.* at 1203.

6. *Ibid.*

7. *Ibid.* (footnotes omitted).

8. Amended Complaint ¶¶ 16, 22.

9. *Id.* at ¶ 17.

Persian Gulf other than through Star Lines for a specified time period.[10] Count 1 alleges that the defendants' conduct constituted a contract, combination and conspiracy in restraint of trade in violation of § 1 of the Sherman Act.[11] Count 2 charges that their conduct constituted an attempt to secure a monopoly for PFEL in the roll-on roll-off cargo service between the East Coast and Persian Gulf in violation of § 2 of the Sherman Act.[12]

*Standing*

Section 4 of the Clayton Act provides that treble damages may be awarded to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C § 15. The courts, in interpreting this section, have limited those categories of persons who may avail themselves of this remedy. *See, e. g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1976); *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262–63 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Long Island Lighting Co. v. Standard Oil Co. of Calif.,* 521 F.2d 1269 (2d Cir. 1975); *Sherman, Antitrust Standing: From Loeb to Malamud,* 51 N.Y.U.L.Rev. 374 (1976). The prospective plaintiff must have suffered "*antitrust injury,* which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra,* 429 U.S. at 489, 97 S.Ct. at 697; *see GAF Corp. v. Circle Floors Co.,* 463 F.2d 752 (2d Cir. 1972). In addition, the plaintiff must show that he is a person "within the 'target area' of the alleged antitrust conspiracy, *i. e.,* a person against whom the conspiracy was aimed . . . ." *Calderone Enterprises Corp. v. United Artists Theatre Circuit,* 454

F.2d 1292, 1295 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *see Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

The standing controversy here focuses upon Star Line's relationship to the East Coast-Persian Gulf, roll-on roll-off, carrier service. Star Lines contends that although PRMSA was the carrier in the trade, it was Star Lines who "operated" the shipping line and who supplied the contacts and expertise which were the critical factors enabling the S.S. Puerto Rico to compete effectively with PFEL's vessels in the trade. Star Lines contends that it suffered antitrust injury by virtue of PRMSA's conduct in that it was temporarily precluded from participating in the trade for lack of a vessel, and that upon obtaining a vessel,[13] it was unable to vie successfully with PFEL for a portion of the market because of PFEL's overwhelming presence in the East Coast-Persian Gulf trade as a result of its acquisition of the S.S. Puerto Rico. Star Lines argues further that as PFEL's "competitor," it was in the center of the target area at which the challenged conduct was aimed. Thus, it is Star Lines' position that it has clearly met the requirements for standing to sue under the antitrust laws.

PRMSA, on the other hand, argues that Star Lines' self-serving characterization of itself as a "competitor" in the East Coast-Persian Gulf trade is without foundation. It was PRMSA who was the carrier in the East Coast-Persian Gulf trade, and as such it was *PRMSA* who vied with PFEL—*not Star Lines.* PRMSA filed the requisite governing tariff with the Federal Maritime Commission for the vessel; PRMSA paid the crew; and PRMSA assumed the risk for

**10.** *Id.* at ¶¶ 18, 24.

**11.** *Id.* at ¶¶ 15–20.

**12.** *Id.* at ¶¶ 21–26.

**13.** The parties disagree as to whether Star Lines or a different company also controlled by Mr. Almogy, the moving force behind Star

Lines, chartered the new vessel—the Star Shapour—since it appears that upon the termination of the agency agreement, Star Lines became a dormant company. *Compare* Affidavit of Stephen Weiss, Financial Vice President of Star Lines, Ltd. ¶ 13 *with* PRMSA's Reply Memorandum at 10 n.4.

any damaged cargo.[14] PRMSA maintains that since Star Lines did not compete in the industry, it could not have suffered antitrust injury to its competitive position; rather, the injury suffered by Star Lines was the simple, commercial injury it incurred because of the termination of its agency contract. PRMSA argues further that Star Lines lacks standing because it is not in the target area of PRMSA's alleged improper conduct. Rather, its status as PRMSA's agent places Star Lines in the same category as the franchisor[15] and the non-participating landlord[16] who have been held to be too remote from the focus of the anticompetitive conduct complained of to avail themselves of the treble damage remedy under 15 U.S.C. § 15.

■ It is clear from the present record that both PRMSA and Star Lines participated in the East Coast-Persian Gulf trade, and that their relationship was governed by the principal-agency agreement of May 18, 1976. The question presented here is whether Star Lines' participation in the conduct of that trade, coupled with any entrepreneurial stake it had in the venture's success, is of a sufficient magnitude to warrant treating Star Lines itself, or Star Lines and PRMSA jointly, as PFEL's

"competitor" for purposes of antitrust standing.[17] If, for example, the captain of the S.S. Puerto Rico were discharged as a result of the conduct here challenged and he claimed that he was competing with PFEL and was injured in his competitive position by virtue of PRMSA's conduct, his claim would obviously be rejected. If, on the other hand, Star Lines had time chartered the vessel outright and operated it in the trade, its standing to challenge the conduct here at issue as PFEL's competitor would be manifest. The present case, quite obviously, falls somewhere in between.[18]

As indicated at oral argument, the court declines to decide this standing issue on the basis of the record presently before it. Additional information would aid the court in properly characterizing Star Lines' relationship to the East Coast-Persian Gulf trade and deciding whether, based on that relationship, Star Lines has standing to bring this action. For example, while it is clear that Star Lines received as compensation a set amount for general and administrative expenses, a set amount for overseas port expenses, and commissions under a schedule varying with the gross weight of the vessel,[19] there is no indication of that propor-

14. Affidavit of Roberto Lugo D'Acosta, Executive Director of PRMSA (Dec. 1, 1977) ¶ 9.

15. *See Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

16. *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).

17. Competitors have long been held to have standing under the antitrust laws to sue for injury to their competitive position. *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., supra* n. 16, 454 F.2d at 1295; *Hunt v. Mobil Oil Corp.*, 410 F.Supp. 10, 19 (S.D.N.Y.1976) (Weinfeld, J.), *aff'd on other grounds*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

18. Alternatively, plaintiff may be able to establish standing based on that line of cases, embodying a concept very similar to that expressed above, which has permitted "those employees who have a distinct commercial enterprise" related to that of their employer to sue

when their employer's anticompetitive practices injure them in their business. *Freeman v. Eastman Whipstock, Inc.*, 390 F.Supp. 685, 688 (S.D.Texas 1975); *see Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 730 (10th Cir.), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973); *Dailey v. Quality School Plan, Inc.*, 380 F.2d 484 (5th Cir. 1967); *Roseland v. Phister Mfg. Co.*, 125 F.2d 417 (7th Cir. 1942); *Broyer v. B. F. Goodrich*, 415 F.Supp. 193 (E.D. Pa.1976); *cf. Vines v. General Outdoor Advertising Co.*, 171 F.2d 487 (2d Cir. 1948). Although PRMSA argues that Star Lines' complaint cannot be read to encompass a cause of action under this theory, as to injury in "its business," assuming Star Lines' business is providing agency services to roll-on roll-off vessels in the East Coast-Persian Gulf trade, we decline to construe the complaint so narrowly. *See Radovitch v. National Football League*, 352 U.S. 445, 453, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957).

19. Affidavit of Roberto Lugo D'Acosta, *supra* n.13, ¶ 8.

tion of Star Lines' income which was dependent on the success of the venture, *i. e.,* the proportion of Star Lines' total income which accrued to it from its commissions. Nor is there any indication of the total income derived from the shipping operation which went to Star Lines as compared with that which went to PRMSA. In addition, evidence of the functions performed by both parties and their importance in enabling the S.S. Puerto Rico to rival PFEL's vessels in the conduct of the trade would aid the court in properly classifying Star Lines' relationship to the industry and to determine thereby its standing to bring suit.

In deciding a motion for summary judgment, a court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought . . . with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975) (citation omitted). In the present case, we conclude, as did Judge Gurfein in *International Railways of Central America v. United Brands Co.,* 358 F.Supp. 1363, 1373 (S.D.N.Y.1973), that "until all the facts are in, we cannot determine whether policy based on precedent will support the standing of the plaintiff to sue. The matter is simply not ripe for summary judgment." Consequently the motion for

summary judgment on standing grounds is denied.

## State Action Immunity

██ PRMSA also argues that summary judgment should be granted in its favor because, as a governmental entity, it is entitled to avail itself of the "so-called state-action exemption" [20] from the antitrust laws established by the Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[21] No question is here raised as to Puerto Rico's status as a "state" for purposes of the applicability of the *Parker* doctrine.[22] Nor do the parties contest PRMSA's status as an instrumentality of the Commonwealth of Puerto Rico. Rather, since it is clear that PRMSA is not entitled to avail itself of the *Parker* immunity "simply by reason of" its status as a state instrumentality,[23] the controversy centers upon what more is required to bring PRMSA's actions which are now at issue within *Parker's* protective shield.

PRMSA contends that the Supreme Court and lower court precedents on the applicability of the *Parker* immunity require only that a governmental entity establish a "specific or reasonably inferrable legislative (or judicial, if a creature of the State Judiciary) intent to *exempt* a state or lesser instrumentality before that instrumentality is held outside the ambit of the

---

**20.** *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 788, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1974). As the Seventh Circuit pointed out in its opinion in *Kurek v. Pleasure Driveway & Park District,* 557 F.2d 580 (7th Cir. 1977), the Supreme Court decisions in this area have recognized that "*Parker* announced no rule of antitrust *exemption* or *immunity*; rather, it determined that the Sherman Act was not intended to apply in the first place to the type of state-mandated activities there at issue. Other courts have nevertheless utilized the single-word shorthand references of 'exemption' or 'immunity.'" *Id.* at 587 n. 5 (emphasis in original).

**21.** As commentators have noted, *see, e. g.,* Handler, *The Current Attack on the* Parker v. Brown *State Action Doctrine,* 76 Colum.L.Rev. 1, 7–10 (1976), the state action doctrine had its genesis in several cases preceding *Parker v. Brown. See Olsen v. Smith,* 195 U.S. 332, 25

S.Ct. 52, 49 L.Ed. 224 (1904); *Lowenstein v. Evans,* 69 F. 908 (C.C.D.S.C.1895). It is sufficient for our purposes, however, to focus our inquiry on *Parker* itself and its progeny.

**22.** *See International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.,* 351 F.Supp. 1153, 1229 (D.Hawaii 1972), *aff'd in part, rev'd in part,* 518 F.2d 913 (9th Cir. 1975); *cf. Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 669–76, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (Puerto Rico held to be a "state" for purposes of the Three-Judge Court Act).

**23.** *City of Lafayette v. Louisiana Power & Light Co.,* ——— U.S. ———, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *see Goldfarb v. Virginia State Bar, supra* n. 20, 421 U.S. at 788–92, 95 S.Ct. 2004.

antitrust laws." [24] To establish that intent, defendant points to the Statement of Motives in the Act creating PRMSA [25] ("Act") which provides that:

> "The legislature of Puerto Rico intends that [PRMSA] acquires and operates shipping lines and terminal facilities as a public service, and that in doing so, it *shall not be subject to the antitrust laws nor any other limitation that could hinder the effective discharge of the endeavor that this act has imposed on [PRMSA]* (emphasis added)."

In addition, § 25 of the Act similarly provides:

> "—Conflicting Laws Inapplicable.—Insofar as the provisions of this act are in conflict with the provisions of any other law, or parts thereof, the provisions of this act shall prevail. Specifically, and without otherwise limiting the generality of the foregoing, it is intended by *this act that the Antitrust Laws shall not be applicable to any action of the Authority taken pursuant to the provisions hereof* (emphasis added)."

PRMSA maintains that in participating in the Persian Gulf trade it was acting in a manner consistent with its general authority under the Act,[26] and since the Puerto Rico Legislature has explicitly expressed its

intention that PRMSA, its instrumentality, not be subject to the restraints and penalties contained in the federal antitrust laws, its immunity under *Parker v. Brown, supra,* is patent.

Star Lines, on the other hand, contends that the *Parker* doctrine has no applicability here. It is Star Lines' position that *Parker* and its progeny require that the state *compel* the particular action complained of—in the present case, PRMSA's establishing PFEL as a monopolist and eliminating Star Lines as a competitor in the East Coast-Persian Gulf trade. The general language relied upon by PRMSA, Star Lines maintains, simply does not satisfy the requirement of a specific legislative mandate.[27]

In order to determine the requirements for *Parker* immunity, a review of the line of Supreme Court cases that have forged the parameters of this doctrine, beginning, of course, with *Parker* itself, is necessary. *See City of Lafayette v. Louisiana Power & Light Co.,* —— U.S. ——, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1974); *Parker v. Brown, supra.*[28]

---

24. Defendant's Reply Memorandum of Law at 34 (emphasis added) (parenthetical in original); *see* Defendant's Supplemental Memorandum of Points and Authorities at 4–5.

25. Act of Puerto Rico Maritime Shipping Authority, Act No. 62 (June 10, 1974).

26. PRMSA relies on the general empowering provision of the Act which states that "[t]he Authority shall have all the powers necessary or convenient to carry out and fulfill the purposes and provisions of this act . . .," Act, *supra* n. 25, § 5, and on an opinion of the Puerto Rico Secretary of Justice interpreting the Act so as to permit PRMSA to operate its vessels on transportation routes that do not include Puerto Rico. Opinion of Carlos R. Ruis, Secretary of Justice, Commonwealth of Puerto Rico (Jan. 26, 1976).

27. Star Lines makes two additional arguments. First, it argues that the *Parker* doctrine does not apply in this case because here the governmental entity conspired with a private corporation and consequently lost whatever immunity

it might otherwise have had. Second, Star Lines contends that to give effect to the broad antitrust exemption provision of the Act creating PRMSA would violate the Supremacy Clause of the Constitution. In light of our disposition in this case, these matters need not be directly addressed. But see discussion n. 31, *infra,* concerning combinations of state and private entities.

28. In the course of this review of Supreme Court precedent, the Court's opinion in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), is not specifically addressed because it dealt with the extent to which "purely private parties" could insulate themselves from antitrust liability under the *Parker* doctrine. Thus, its analysis is not "necessarily applicable" to the case at bar, which involves a suit against a governmental entity. *City of Lafayette v. Louisiana Power & Light Co., supra* n. 23, —— U.S. at —— n. 40, 98 S.Ct. at 1135–36 n. 40.

In *Parker v. Brown, supra,* a California raisin grower sought to enjoin the Director of the California Department of Agriculture from enforcing a state regulatory program controlling the marketing of raisins "so as to restrict competition" and "maintain prices" in the industry. 317 U.S. at 346, 63 S.Ct. 307 at 311. The program was adopted pursuant to the California Agricultural Prorate Act whose purposes were "to 'conserve the agricultural wealth of the State' and to 'prevent economic waste in the marketing of [its] agricultural crops.'" *Ibid.* Brown claimed that this program was a contract, combination and conspiracy in restraint of trade and an attempt to monopolize the raisin industry in violation of §§ 1 and 2 of the Sherman Act.

The Supreme Court rejected Brown's argument and declined to enjoin enforcement of the prorate program. It reasoned that nothing in the language or history of the Sherman Act "suggest[ed] that its purpose was to restrain a state or its officers from activities directed by its legislature." *Id.* at 350, 63 S.Ct. at 313. Speaking broadly, the Court held that in those cases where the state, "as sovereign," imposes a restraint on trade "as an act of government," the provisions of the Sherman Act do not apply. *Id.* at 352, 63 S.Ct. 307. Since the California regulatory program was imposed upon the raisin industry by decision of the legislature pursuant to an articulated governmental policy, the program was held to be a restraint "which the Sherman Act did not undertake to prohibit." *Ibid.*

Some thirty years later,[29] in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court issued the first of a series of recent opinions defining the scope of the *Parker* exemption.[30] The plaintiff in *Goldfarb* sued the County Bar Association (a private entity) and the State Bar Association (a state entity) for their participation in the maintenance of a minimum-fee schedule in Fairfax County, Virginia. The County Bar had published the fee schedules and the State Bar had supplied the enforcement mechanism by publishing reports condoning the schedules and issuing ethical opinions stating that such schedules could not be ignored. Both Bar Associations sought to avail themselves of the *Parker v. Brown* immunity; both were unsuccessful.

Chief Justice Burger wrote that "[t]he threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is *required by the State acting as sovereign.*" 421 U.S. at 790, 95 S.Ct. at 2015 (emphasis added). The Court held that in the instant case there was no need to travel beyond that initial inquiry because it could not "fairly be said that the State of Virginia through its Supreme Court rules required the anticompetitive activities" of either of the Bar Associations. *Ibid.* They were not directed by the Supreme Court's ethical codes to supply fee schedules or to require any type of price floor. The most that could be said of their activities was that they "'complimented the objectives of the ethical codes.'" *Id.* at 791. But "it is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities *must be compelled by direction of the State acting as sovereign.*" *Ibid.* (emphasis added).[31]

---

**29.** During that thirty year period, the Supreme Court left the development of the state action doctrine in the hands of the lower courts. *See* Note, Parker v. Brown *revisited: The State Action Doctrine After* Goldfarb, Cantor, *and* Bates, 77 Colum.L.Rev. 898, 899–900, n.8 (1977).

**30.** *See City of Lafayette v. Louisiana Power & Light Co., supra* n. 23; *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co., supra*

n. 28; *Goldfarb v. Virginia State Bar, supra* n.20.

**31.** In addition, Chief Justice Burger wrote that the State Bar "ha[d] voluntarily joined in what was essentially a private anticompetitive activity, and in that posture cannot claim that it is beyond the reach of the Sherman Act." 421 U.S. at 791, 95 S.Ct. at 2015 (footnote omitted). The precise import of this language is unclear. The language cannot be read as saying that every time a state agency joins together with a

The importance of the *Goldfarb* opinion in the development of the *Parker* doctrine is twofold. First, it dispelled any notion that a state instrumentality was automatically immune from liability under the antitrust laws. *Compare State of New Mexico v. American Petrofina, Inc.*, 501 F.2d 363 (9th Cir. 1974) *with Kurek v. Pleasure Driveway & Park District*, 557 F.2d 580, 590 (7th Cir. 1977). Second, the Chief Justice's opinion indicated that the issue of state mandate was only the initial inquiry in determining whether the *Parker* immunity applies, and that before the anticompetitive activities of a state entity are insulated from the provisions of the Sherman Act something more is required.

More recently, in *Bates v. Arizona State Bar, supra*, the Court suggested what that "something more" is. Several members of the Arizona State Bar Association (a state entity) sued the Association challenging its enforcement of a disciplinary rule barring advertising by lawyers. Their challenge was based, in part, on the ground that enforcement of the rule constituted a violation of §§ 1 and 2 of the Sherman Act.

The Supreme Court upheld the applicability of the *Parker* immunity to the actions of the State Bar Association because the restraint on advertising at issue in *Bates* was the affirmative command of the Arizona Supreme Court—"the ultimate body wielding the State's power over the practice of law." *Id., 97 S.Ct.* at 2697. Thus, unlike *Goldfarb*, the restraint was " 'compelled by direction of the State acting as sovereign.' " *Id.* at 2697, *quoting Goldfarb v. Virginia State Bar, supra*, 421 U.S. at 791, 95 S.Ct. 2004. But in concluding that *Parker* applied, the Court went beyond the issue of state mandate and emphasized the strong state interest in regulating the bar and the active supervision of the professional behaviour of bar members by the State Supreme Court. *Id.* at 2698; *see City of Lafayette v. Louisiana Power & Light Co., supra,* —— U.S. at ——, 98 S.Ct. at 1123.

In *City of Lafayette v. Louisiana Power & Light Co., supra*, decided this term, a plurality of the Supreme Court synthesized these earlier cases and articulated the minimum standard which courts must apply in determining whether the actions of a state instrumentality fall within *Parker's* protected shelter. At issue was the availability of the *Parker* immunity to the cities of Lafayette and Plaquemine ("Cities") in a suit for antitrust violations allegedly committed by them in conjunction with their ownership of public utilities. The district court begrudgingly recognized their immunity, but the Court of Appeals for the Fifth Circuit reversed,[32] and the Supreme Court affirmed the appellate holding by a five-to-four margin.

Justice Brennan delivered the opinion of the Court, in which three other justices

---

private entity in an activity which can be characterized as anticompetitive, the agency thereby loses its immunity under *Parker*. In *Parker* itself private parties suggested the prorate zones and played a significant part in the form of anticompetitive constraint imposed on the industry. The critical distinction between *Parker* and *Goldfarb* was the presence of state mandate in the former and its absence in the latter, not the presence or absence of state-private interaction.

On the other hand, this language in *Goldfarb* cannot be read to mean that before the antitrust laws apply to a state entity, not only must it act in an anticompetitive manner and without an adequate state mandate, but it must also act in conjunction with private parties. *See City of Lafayette v. Louisiana Power & Light Co., supra* n.23. *But see id.,* — U.S. at ——, 98 S.Ct. at 1151–52 (Blackmun, J., dissenting). In *City of Lafayette*, the Supreme Court held that cities might be held liable if, without adequate state mandate, they engaged in illegal tying arrangements in the operation of their public utilities. In these tying arrangements, the only party acting anticompetitively is the city itself. There is no joint, private-governmental, anticompetitive enterprise. Yet, absent state mandate, the antitrust laws apply to prohibit such conduct. Thus, this second possible reading of the *Goldfarb* opinion appears untenable.

However, we need not here decide the precise import of this section of the Chief Justice's opinion since it is clear that in this case the activity that is challenged is anticompetitive conduct engaged in by the "state's" instrumentality in combination with a private entity, and, thus, whatever additional elements this language of the *Goldfarb* opinion may be read as requiring, before a state entity may be subjected to the antitrust laws, they are met here.

**32.** 532 F.2d 431 (5th Cir. 1976).

joined. The *Lafayette* plurality held that cities, like other instrumentalities of the state, are not exempt from the applicability of the antitrust laws simply by virtue of their status as governmental entities. —— U.S. at ——, 98 S.Ct. at 1137. "[T]he *Parker* doctrine exempts only anticompetitive conduct *engaged in as an act of government by the State as sovereign*, or, by its subdivisions, *pursuant to state policy to displace competition with regulation or monopoly public service.*" *Ibid.* (emphasis added). And with respect to the issue of state mandate, the plurality concluded that a governmental body need not "point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit. . . . [A]n adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.'" *Id.* at ——, 98 S.Ct. at 1138 (footnote omitted), *quoting & affirming* 532 F.2d 431, 434 (5th Cir. 1976).

Chief Justice Burger provided the fifth vote for affirmance of the lower court opinion in *City of Lafayette*. Although the Chief Justice did not join in that portion of the plurality opinion which articulated the standard for invoking the *Parker* exemption, his concurrence makes clear that he regarded the plurality's approach as the *minimum* showing which should be required of a state instrumentality when it is acting in a "proprietary capacity" before it is allowed to avail itself of the protections of *Parker v. Brown, supra.*[33] And Justice Marshall, although authoring a separate concurrence,[34] clearly endorsed the plurality's standard. Therefore, if the conduct of a governmental entity fails to satisfy the standard set forth in Justice Brennan's opinion in *City of Lafayette*, five of the Supreme Court Justices would hold that the conduct in question did not fall within the holding of *Parker v. Brown, supra*, and, thus, was not beyond the reach of the antitrust laws.

The Court's opinion in *City of Lafayette* clarified two important aspects of the evolving *Parker* doctrine. First, the opinion approved the flexible standard of the lower courts[35] for establishing whether a state instrumentality had been directed to engage in a form of anticompetitive conduct by the state as sovereign. Second, and more important for our purposes, the Court articulated that which had been presaged by its earlier decisions—that beyond the issue of state mandate, the challenged anticompetitive activity must also serve a governmental policy of displacing traditional market forces "with regulation or monopoly public service." —— U.S. at ——, 98 S.Ct. at 1144.

33. —— U.S. at ——, —— n.6, 98 S.Ct. at 1143, 1143 n.6.
Chief Justice Burger would require a more extensive showing than that required by the plurality before a governmental entity acting in a "proprietary capacity," *i. e.*, engaging in "'business activity . . . in which a profit is realized,'" —— U.S. at ——, 98 S.Ct. at 1139, could avail itself of the protections of the *Parker* doctrine. First, the Chief Justice would require a stronger showing that the state intended to replace competition with regulation, *i. e.*, that it had "compelled" the anticompetitive activities, rather than merely "contemplated" them. *Id.* at —— n.6, 98 S.Ct. at 1143 n.6. Second, Chief Justice Burger would require a showing that the "implied exemption from federal law 'was necessary in order to make the regulatory Act work, "and even then only to the minimum extent necessary."'" *Id.* at ——, 98 S.Ct. at 1143. In other words, the exemption must be "*essential*" to the State's regulatory scheme, —— U.S. at —— n.6, 98 S.Ct. at 1143 n.6 (emphasis in original), before it would remove the anticompetitive activity from the reach of the antitrust laws.

34. —— U.S. at ——, 98 S.Ct. at 1139. Justice Marshall's concurrence simply makes the point that he regards the plurality's approach as embodying the core of the concerns expressed by the Chief Justice in his separate opinion. Thus, Justice Marshall reads the plurality's standard as requiring that state anticompetitive restraints be no broader than "necessary to effectuate governmental purposes." *Ibid.*

35. *See Kurek v. Pleasure Driveway & Park District, supra* n. 20; *City of Lafayette v. Louisiana Power & Light Co.*, 532 F.2d 431 (5th Cir. 1976), *aff'd*, —— U.S. ——, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Duke & Co. v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975).

This review of Supreme Court decisions makes clear that PRMSA misconceives the nature of the doctrine established in *Parker v. Brown, supra. Parker* did not hold that Congress had left it to each state legislature to determine the extent to which a particular government agency under its control should be exempt from the provisions of the Sherman Act. The *Parker* court itself cautioned that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at 351, 63 S.Ct. at 314. Rather, *Parker* held that considerations of federalism dictated that courts not lightly attribute to Congress "an unexpressed purpose to nullify a state's control over its officers and agents." *Ibid.; accord, City of Lafayette v. Louisiana Power & Light Co., supra,* —— U.S. at ——, 98 S.Ct. at 1123. Therefore, the threshold inquiry called for in each case is whether the state, acting as a sovereign, had required the instrumentality in question to engage in a *particular form* of anticompetitive conduct. *See, e. g., Bates v. State Bar, supra* (ban on advertising); *Goldfarb v. Virginia State Bar, supra* (minimum fee schedules). This does not mean, as Star Lines suggests, that in order for *Parker* to apply a state legislature must direct its instrumentality to perform a specific anticompetitive act, such as entering into an illegal contract with a specified private party. Rather the legislature must direct its instrumentality to engage in a particular type of anticompetitive activity, and then each subsequent action of that *type* will have satisfied the threshold requirement for *Parker* immunity.

PRMSA has not referred the court to a single case which has focused its *Parker* inquiry on a state's intent to exempt its instrumentality from the applicability of the antitrust laws.[36] As the plurality opinion in *City of Lafayette* explained, "it is far too late to argue that a State's desire to insulate anticompetitive practices not imposed by it as an act of government falls within the *Parker* doctrine." —— U.S. at ——, 98 S.Ct. at 1138; *accord, id.* at ——, 98 S.Ct. at 1123 (Marshall, J., concurring). Thus, it is clear that the blanket antitrust exemption provisions contained in the Act creating PRMSA do not in and of themselves confer antitrust "immunity" upon PRMSA.

The question remains, however, as to whether PRMSA's activities meet the standard for *Parker* immunity set out by the plurality in *City of Lafayette v. Louisiana Power & Light Co., supra.* Upon examination of the Act and its underlying purpose, the court concludes that PRMSA's actions do not qualify for *Parker* immunity because they were neither compelled by the state acting as sovereign nor executed pursuant to any governmental policy to displace market forces in the area in which PRMSA's activities took place.

In creating PRMSA, the Puerto Rico Legislature sought to assure the island of a "complete, reliable and economical maritime transportation system for cargo and passengers between Puerto Rico and

---

**36.** In *Hecht v. Pro-Football, Inc.,* 144 U.S.App. D.C. 56, 444 F.2d 931 (1971), the Court of Appeals for the District of Columbia Circuit faced a situation where the Armory Board for the Robert F. Kennedy Stadium, a Board which was created pursuant to an Act of Congress of 1957, 2 D.C.Code § 1720 *et seq.,* was sued for violating the antitrust laws in that it had entered into a restrictive covenant with the Washington Redskins prohibiting the use of the stadium by any professional football team other than the Redskins for a thirty year period. The Board tried to invoke the *Parker* immunity for governmental action and relied heavily on a provision of the Act creating it which provided that the Board was "authorized *without regard to any other provision of law* . . . to rent or lease from time to time for any of the purposes of this sub-chapter, *all or any part or parts of the stadium* . . . ." *Id.* 144 U.S. App.D.C. at 58, 444 F.2d at 933, *quoting* 2 D.C.Code § 1723. The *Hecht* court rejected the Board's contention, reasoning that Congress had not authorized nor intended the Board to engage in the type of anticompetitive activity at issue in the case before it. Of course, the *Hecht* court had to determine whether *Congress* in enacting this exculpatory provision had intended to provide the Armory Board with an absolute exemption from the applicability of the antitrust laws—a power which Congress clearly maintains. *See* 444 F.2d at 935. But, as indicated above, that same power does not reside in the legislatures of the various states.

abroad."[37] It conferred upon PRMSA all the powers necessary and convenient for PRMSA to fulfill the purposes of the Act, including all the general corporate powers such as the right to contract and the right to enter into agreements.[38] In addition, the broad antitrust exemptions which the legislature tried to confer upon PRMSA indicate that some anticompetitive activity on PRMSA's part was contemplated.[39] But the conduct which plaintiff challenges here is PRMSA's entry into a contract with PFEL—a private corporation with no relationship to Puerto Rico—allegedly to establish a monopoly for PFEL in a line of commerce unrelated and far removed from the shores of Puerto Rico. Certainly if the conduct being challenged here were that PRMSA had reduced competition in the Puerto Rican-East Coast trade by acquiring a majority of those vessels suitable for engaging in that trade,[40] or that PRMSA had contracted with a single private company to control Puerto Rico's port facilities,[41] PRMSA's claim to antitrust immunity would be on much stronger ground. *See Kurek v. Pleasure Driveway & Park District, supra,* 557 F.2d at 590–91, 590–91 nn. 7–8. Such conduct might be characterized as having been contemplated by the legislature in order to insure complete and reliable carrier service and/or proper maintenance of the port facilities. But the connection between the legislative grant of power to PRMSA and its use of that power under the facts of this case is simply "too tenuous to permit the conclusion that the entity's intended scope of activity included such conduct." *City of Lafayette v. Louisiana Power & Light Co.,* 532 F.2d 431, 434 (5th Cir. 1976), *aff'd,* —— U.S. ——, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

In order to support its claim of state mandate, PRMSA relies heavily on an opinion by the Puerto Rico Secretary of Justice to the effect that PRMSA was authorized under the Act to utilize its ships on trade routes which did not include stops in Puerto Rico during slack periods in the trade between Puerto Rico and the mainland.[42] Yet we fail to see how PRMSA's authority in this regard suggests an intention by the legislature that in the conduct of its business on these foreign trade routes PRMSA should seek to establish a foreign, private entity as a monopolist of a particular route and seek to eliminate all other competition from participating in that trade. Such a reading of the Act taxes the imagination, and we decline to adopt it. Therefore, the activities in which PRMSA engaged were not compelled by the state as sovereign and, thus, do not fall within the ambit of the *Parker* doctrine.

Moreover, even if it could be said that the legislature contemplated this type of anticompetitive behaviour by PRMSA, so that the initial requirement for *Parker* immunity were met, PRMSA's conduct fails to satisfy the second element of the applicable

---

**37.** Act, *supra* n.25, § 2. The full statement of public policy underlying the act provides:

> "The Legislature finds and determines that in order to insure that the citizens of the Commonwealth of Puerto Rico have an adequate and inexpensive supply to basic commodities, and to foster the development and expansion of trade and industry within the Commonwealth, all of which is essential to the economic growth of the Commonwealth, and to the full employment and prosperity of its citizens, it is necessary to maintain a complete, reliable and economical maritime transportation system for cargo and passengers between Puerto Rico and abroad. It is the purpose of this act to provide the means for establishing and maintaining a maritime transportation system for the benefit of the people of the Commonwealth, and for the protection of their health and welfare."

**38.** *Id.* at § 5.

**39.** *Id.* at Statement of Motives, § 25.

**40.** *See Ladue Local Lines, Inc. v. Bi-State Development Agency,* 433 F.2d 131 (8th Cir. 1970); *Continental Bus System, Inc. v. City of Dallas,* 386 F.Supp. 359 (N.D.Texas 1974).

**41.** *See E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52 (1st Cir.), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *Murdock v. City of Jacksonville, Florida,* 361 F.Supp. 1083 (M.D.Fla. 1973).

**42.** Opinion of Carlos R. Ruis, *supra* n. 26.

standard—that the challenged anticompetitive restraint be imposed pursuant to state policy "to displace competition with regulation or monopoly public service." —— U.S. at ——, 98 S.Ct. at 1137. The Puerto Rico Legislature adopted no governmental policy to displace competition in the conduct of international commerce on a trade route completely removed and unrelated to Puerto Rico. Rather, the legislature focused on insuring adequate carrier and passenger service between Puerto Rico and the mainland. Thus, it simply cannot be argued that the restraint here at issue was executed pursuant to a governmental policy to replace competition with regulation or monopoly public service. Furthermore, if one interprets this section of the plurality opinion in the manner suggested by Justice Marshall in his concurrence, i. e., that to satisfy this standard the anticompetitive restraints imposed by the state must be no broader than "necessary to effectuate governmental purposes," —— U.S. at ——, 98 S.Ct. at 1123, the conclusion reached here becomes even more patent. Imposing restraints in lines of commerce unrelated to Puerto Rico is simply unnecessary to effectuate the governmental purposes which Puerto Rico sought to accomplish in creating PRMSA—maintenance of proper carrier service between Puerto Rico and the mainland. Therefore, even if PRMSA's activities were mandated by the "state," they were not pursuant to a governmental policy "to displace competition with regulation or monopoly public service," [43] and, consequently they are not beyond the reach of the Sherman Act.

Accordingly, PRMSA's motion for summary judgment is denied.

IT IS SO ORDERED.

---

43. *City of Lafayette v. Louisiana Light & Power Co., supra* n.23, ·· U.S. at ——, 98 S.Ct. at 1123.