Lloyd E. WILLIAMS, Jr. and Mildred A. Williams, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 92–3691.

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1993.

Decided July 23, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 31, 1993.

J. Gordon Hansen (argued), Scott R. Carpenter, Parsons, Behle & Latimer, Salt Lake, UT, for petitioners-appellants.

Gary R. Allen, Teresa McLaughlin, Sara S. Holderness (argued), Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellee.

Before POSNER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

Section 483 of the Internal Revenue Code, before it was amended in 1984, provided that if the first installment of the price for a purchase was not due for more than six months, the purchaser could pretend that he had borrowed the amount of the installment from the seller and could compute—and when he finally paid the installment, deduct from his taxable income—the portion of the installment that represented·implicit interest on the "loan." The method of calculating this implicit interest was extremely favorable to the taxpayer. The taxpayers in this case took such an interest deduction, but were assessed a deficiency on the ground that the sale had occurred when the first installment was due (and paid) rather than, as they had believed, more than six months earlier. The Tax Court agreed with the Internal Revenue Service. 63 T.C.M. (CCH) 2959, 1992 WL 95656 (1992).

The taxpayers argue that the Tax Court was precluded by either the doctrine of res judicata or (somewhat more plausibly) the doctrine of law of the case from disallowing the deduction. The case had initially been assigned to a judge of the Tax Court, who granted partial summary judgment for the taxpayers, 94 T.C. 464, 1990 WL 29267 (1990), implicitly (the taxpayers argue) resolving the main issue in this case—the applicability of section 483—in their favor. The case was later reassigned to another judge, who reached the opposite conclusion. If the same judge had handled the case throughout, the law of the case doctrine would not have prevented him from reversing himself, *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir.1991); *Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir.1985); *Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131, 134 (2d Cir.1956) (L. Hand, J.), unless the time for reconsideration had expired. *Johnson v. Burken, supra*, 930 F.2d at 1207. This is an important qualification, though inapplicable here. If a final judgment had been entered, the case appealed, the judgment reversed, and the case remanded, the trial judge would be required to adhere on remand to the rulings that he had made before the case was first appealed, provided of course that they had not been set aside by the appellate court.

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C.Cir. 1987); cf. *General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 489 F.2d 1105, 1124 (6th Cir.1973); *Dillard v. Chesapeake & Ohio Ry.*, 136 F.Supp. 689, 691 (S.D.W.Va. 1955). Even more clearly would he be required—this is the most elementary application of the doctrine of law of the case—to comply with the rulings of the appellate .court. *Johnson v. Burken, supra*, 930 F.2d at 1207.

The situation is different when judges are changed in midstream. Litigants have a right to expect that a change in judges will not mean going back to square one. The second judge may alter previous rulings if new information convinces him that they are incorrect, but he is not free to do so even though the time for reconsideration·has not expired, merely because he has a different view of the law or facts from the first judge. *Peterson v. Lindner, supra*, 765 F.2d at 704; *Diaz v. Indian Head, Inc.*, 686 F.2d 558, 562–63 (7th Cir.1982); *Dictograph Products Co. v. Sonotone Corp., supra*, 230 F.2d at 134–35; *United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir.1970); see generally Annot., 20 A.L.R.Fed. 13 (1974 and 1992 Supp.). In this situation the doctrine of law of the case has bite. But as explained in *Peterson v. Lindner, supra*, 765 F.2d at 704–05, the bite is lessened when the case is appealed. At that point, if rulings by the district court on issues of law are challenged the question is not whether the second judge should have deferred to the ruling of the first judge, but whether that ruling was correct. If it was, the ruling of the second judge was incorrect, whether or not he even had the power to make it, and the aggrieved party is entitled to obtain correction on appeal even if the second trial judge should not have tried to correct it himself. *Champaign–Urbana News Agency, Inc. v. J.L. Cummins News Co.*, 632 F.2d 680, 683 (7th Cir.1980). Matters stand differently if the rulings challenged are not ones on which appellate review is plenary. Suppose they concerned a discretionary matter. Then even though the first and second judges had disagreed, neither might have committed reversible error, and the law of the case doc-

trine would require the court of appeals to defer to the first judge's ruling. *Moses v. Business Card Express, Inc.,* 929 F.2d 1131, 1137–38 (6th Cir.1991). With this important exception, the doctrine when applied at the appellate level concerns previous rulings by the appellate court itself. If a case that the court had remanded should return after the proceedings on remand, the court will not reexamine its previous rulings unless there is a compelling reason, such as an intervening change in law, to do so. *Evans v. City of Chicago,* 873 F.2d 1007, 1014 (7th Cir.1989).

If the rulings by the two Tax Court judges in the present case had been inconsistent, and the rulings had concerned discretionary matters as to which appellate review is limited, the taxpayers might, therefore, have a good argument based on the doctrine of law of the case. But the rulings were not inconsistent. The first rejected one set of contentions of the Internal Revenue Service; the second accepted another contention of the Service. Rejecting arguments a and b does not imply the rejection of c unless it is related to a or b in particular ways, and in this case it was not.

■ The taxpayers' alternative suggestion, that the Tax Court's initial ruling had res judicata (they mean collateral estoppel) effect, is frivolous. Only a final judgment has such effect. *G. & C. Merriam Co. v. Saalfield,* 241 U.S. 22, 28, 36 S.Ct. 477, 479, 60 L.Ed. 868 (1916); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4432 (1981). What is true is that a judgment final in the trial court may have collateral estoppel effect even though the loser has not exhausted his appellate remedies. 18 *id.,* § 4433 at pp. 308–15; *Restatement (Second) of Judgments* § 13, comment f, at p. 135 (1980); *Kurek v. Pleasure Driveway & Park District,* 557 F.2d 580, 595 (7th Cir.1977), vacated on other grounds, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978); *Martin v. Malhoyt,* 830 F.2d 237, 264 (D.C.Cir.1987). And it has been suggested that this rule might be extended to certain cases of summary judgment and even of partial summary judgment. 18 Wright, Miller & Cooper, *supra,* § 4434 at p. 325; cf. *Miller Brewing Co. v. Joseph*

*Schlitz Brewing Co.,* 605 F.2d 990, 996 (7th Cir.1979); *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89–90 (2d Cir.1961) (Friendly, J.). But the purpose would be to cut off a litigant's right to press or contest the same issues in different suits when one of the suits is almost though not quite concluded. 18 Wright, Miller & Cooper, *supra,* § 4434 at p. 328. There is no basis for using res judicata or collateral estoppel to prevent a judge from reconsidering an earlier ruling in the same, ongoing case.

■ So much for procedural matters; we turn to the tax issue. On June 22, 1983, the taxpayers signed a contract to buy an unfinished ski condominium in Utah from the developer-builder. The contract fixed a purchase price of $1,514,000, of which $10,000 was to be paid immediately and the balance in two installments as specified in the buyers' promissory note, dated the next day. The first installment, of $477,000, was to be paid on what the contract called the "settlement date," December 30, 1983, and the balance on July 24, 2013. The note recited that no interest was to be payable on it but of course the note itself is mostly interest—the appraised value of the (completed) condominium in 1983 was only $500,000. The contract required the seller to execute and place in escrow a warranty deed to be delivered to the buyers on the settlement date; and it required the buyers both to execute a quitclaim deed and place it in escrow from which it would be delivered to the seller if the buyers defaulted on the contract, and to execute a judgment note for $50,000 which would be returned to the buyers on the settlement date. The contract further recites that the buyers entered into possession of the condominium on June 22 (though it hadn't been completed yet—indeed was not far beyond the foundations stage) and became liable for real estate taxes on that day and that if the buyers break the contract before the settlement date the seller's "sole remedy" is to retain the down payment, enforce the judgment note, and, of course, get the condominium back. If the seller breaks the contract before the settlement date, the buyers' "sole and exclusive remedy" is to

rescind the contract and get back their down payment and the judgment note.

The contract was performed as agreed. The Tax Court held that the actual sale of the condominium did not take place until the settlement date. The buyers (the taxpayers) argue that it took place on the date of the contract, which was a few days more than six months previously. The question when the sale took place is a question of fact for purposes of appellate review, *Durkin v. Commissioner,* 872 F.2d 1271, 1275 (7th Cir. 1989); *Major Realty Corp. v. Commissioner,* 749 F.2d 1483, 1486 (11th Cir.1985), so we can reverse only if we think the Tax Court was clearly in error. We are not so blinded by our own jargon as to think it is *really* a question of fact—the sort of question a layman with no instruction in legal principles could answer. Obviously it is a question about the proper application of a legal standard to the (real) facts. Since, however, it requires a judgment based on the idiosyncratic facts of a particular case rather than the formulation of a general rule, it is one best confided to the first-line judicial officer subject to only light appellate review. On the basis of this reasoning what are sometimes called "mixed questions of fact and law" or "ultimate questions of fact," but, more precisely, are the application of law to facts, are governed by the clear-error standard, just like laymen's facts. *Hartford Accident & Indemnity Co. v. Sullivan,* 846 F.2d 377, 384 (7th Cir.1988); *Mucha v. King,* 792 F.2d 602, 605 (7th Cir.1986).

The taxpayers argue that if title passed on June 22 or 23 under Utah law, section 483 applies. The government ripostes that the time of sale for purposes of the statute is a question of federal law. Congress can define "sale" any way it wants, but as there is no usable definition of the word in the Internal Revenue Code or Treasury Regulations, see *Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (Treas.Reg. § 1.1002–1(d) is truistic), we assume that section 483 simply attaches federal tax consequences to a transaction defined by state law. *United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985); *Poe v.*

*Seaborn,* 282 U.S. 101, 110, 51 S.Ct. 58, 58, 75 L.Ed. 239 (1930); *Commissioner v. Stuart,* 300 F.2d 872, 875 (3d Cir.1962). Each state has a well-developed body of law determining the time when title passes in a sale, and taxpayers ought to be able to rely on that law in structuring their transactions. It is doubtful, to say the least, that a state would jigger its sales law just to permit a taxpayer to take advantage of the esoteric largesse of 26 U.S.C. § 483. And if the sole purpose of a transaction is to beat federal taxes, the Internal Revenue Service can ignore the legal form and recharacterize the transaction in accordance with its true purpose. *Yosha v. Commissioner,* 861 F.2d 494 (7th Cir. 1988); *Bramblett v. Commissioner,* 960 F.2d 526, 533 (5th Cir.1992). The government invoked the doctrine of "substance over form" as an alternative ground in this case, but the Tax Court found it unnecessary to consider it, as do we.

The taxpayers argue that the sale occurred in June under Utah law because the contract of sale vested "equitable title" in them, enabling them to obtain specific performance if the seller defaulted. The first point is unhelpful, and the second incorrect. A contract to buy real estate in the future vests the buyer with "equitable title" on the day the contract is signed, in the sense that he is entitled to seek the aid of a court of equity in obtaining full legal title should the seller balk at honoring the agreement. *Butler v. Wilkinson,* 740 P.2d 1244, 1255 and n. 5 (Utah 1987). Nevertheless there is a distinction between a sale on the one hand and a contract for a future sale on the other, and we do not understand the taxpayers to be arguing that if the latter is the proper characterization of their contract the "sale" took place on the day it was signed. Of course if the seller is retaining legal title merely as security, as in many installment land sales, the contract of sale will be reconceived as *the* sale, and title will be deemed to pass when the contract is signed. *Id.* at 1254–55; *C & J Industries, Inc. v. Bailey,* 618 P.2d 58 (Utah 1980). This is not such a case. The parties contemplated that formal legal title would pass to the buyers long before the latter had paid the installment note in full.

There was no vesting of "equitable title" in any sense, because the contract excluded a suit for specific performance by the buyers. That the contract allowed the seller in effect to rescind at will until December 30 reinforces the inference that that is the day on which the sale actually took place. The taxpayers argue, however, that the Utah courts would not honor the parties' agreement to exclude the buyer's remedy of specific performance. It is true that the specification of a particular remedy does not by itself exclude a remedy of specific performance. *Kelley v. Leucadia Financial Corp.*, 846 P.2d 1238, 1241–43 (Utah 1992); *Restatement (Second) of Contracts* § 361 (1981). But where as in this case the parties say that they are specifying an *exclusive* remedy, their agreement ordinarily will be honored, in Utah as elsewhere. *Kelley v. Leucadia Financial Corp., supra*, 846 P.2d 1238, 1242–43. The taxpayers argue that if this is so it makes the seller's contractual undertaking illusory by allowing him to rescind at will without consequence, and therefore it cannot be so. Despite much lore to the contrary, however, a promise is not necessarily "illusory" merely because it is not enforceable, although its unenforceability may excuse the other party from having to perform. *Truck Insurance Exchange v. Ashland Oil, Inc.*, 951 F.2d 787, 790 (7th Cir.1992). Contracts have other purposes besides setting the stage for a lawsuit, notably to clarify the parties' understanding of the terms upon which they are to deal. No doubt there is a strong presumption of enforceability, as we noted recently in *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1295–96 (7th Cir.1993). But we cannot imagine why the courts of Utah would want to override an express provision in a contract between financially sophisticated parties (the principal taxpayer is a lawyer). And even if, to remove the "illusion," a Utah court would interpolate a buyer's remedy of specific performance, *Ocean Dunes of Hutchinson Island Development Corp. v. Colangelo*, 463 So.2d 437 (Fla.App.1985); E. Allan Farnsworth, *Contracts* § 2.13 (2d ed. 1990), this would only make the contract a typical buyer's option, not a sale before the option was exercised.

The Tax Court in fact described the contract as an option contract. If the buyers backed out, the seller would get $60,000. The buyers acquired not a legal right but merely an opportunity to buy the condominium on the settlement date. The seller acquired not a buyer but the right to be paid $60,000 if the buyers decided not to buy. Even if the condominium had been completed so that the buyers could have moved in on June 22, they would not have "owned" the condominium then any more than a tenant owns his landlord's building; and the fact that the buyers agreed to pay real estate taxes from June 22 on and may have borne the risk of loss from fire or earthquake would not change the essential character of the transaction. If the value of the property appreciated substantially before December 30, the seller would return the buyers' down payment and sell the condominium for a higher price to someone else. However the buyers' interest should be described, it was nothing like what Utah or any other jurisdiction calls ownership.

The flaw in the Tax Court's analysis is that the seller delivered a warranty deed to the escrow agent on June 23 with instructions to deliver it on the settlement date to the buyers, who argue that the sale therefore was fully executed on June 23 and the seller could not have walked away from it afterward. If the buyers came up with the $477,000 first installment due on December 30, the escrow agent was required to give them the deed, period. Nothing in the contract, or in any other document exchanged between the parties, authorized the seller to instruct the escrow agent to return the deed to him, unless the buyers broke the contract; the entire purpose of an escrow arrangement is to place property beyond the reach of the parties unless stated contingencies materialize. 4 Herbert Thorndike Tiffany, *Law of Real Property* § 1050 (3d ed. 1975). There is no inconsistency with the provision limiting the buyers' remedy for breach of the contract of sale to rescission, since the seller could have broken the contract by not completing the condominium. He could not have broken it, however, given the escrow arrangement, by refusing to complete the sale on December 30.

A side agreement between the parties that was effectively a part of the contract of sale required the seller to obtain a financial institution's commitment to finance the sale. The seller could have broken this promise, but if the property had appreciated in value the buyers would have had no difficulty obtaining financing elsewhere; so again the seller could not have retained or obtained the benefits of ownership. Still, if the seller had wanted to get out of the contract, all he had to do was delay completion of the condominium. Unless the property had appreciated at an astronomical rate, the buyers would not have been willing to plunk down $477,000 on December 30 for a piece of land with an excavation and a few beams—all there had been in June. (The contract required the seller to "use reasonable efforts to have the Condominium fully constructed and ready for occupancy by December 30," and in any event to complete it except for finish by 200 days from June 22, which would be sometime in January.) The buyers' only recourse would be to rescind and get their money back.

All this said, there was something more here than a pure seller's option. But so what? If the seller was hogtied, all this means is that the contract was not a seller's option. That would not make it a sale. In this case it would make it a buyer's option. By waiving any right to seek specific performance or damages—by agreeing that if the buyers defaulted the only consequence would be that the sale would not go through and the buyers would forfeit $60,000 (unlike *Fletcher v. United States*, 303 F.Supp. 583, 588–89 (N.D.Ind.1967), aff'd, 436 F.2d 413 (7th Cir.1971) (per curiam), where the right to sue for compensatory damages was retained)—the seller in effect sold a purchase option (a call) for $60,000. The sale of a call for $60,000 is not the sale of a house for $500,000. *Commissioner v. Stuart, supra.* It is true that as the amount to be forfeited creeps toward the purchase price of the house, a point is reached at which the sale is not of the call but of the house, as in *Commissioner v. Baertschi*, 412 F.2d 494 (6th Cir.1969). In *Baertschi* the forfeiture was of a down payment equal to 29 percent of the purchase price, and that was held to cross

the line. *Id.* at 498. Here it was 12 percent, and—or so the Tax Court could hold without committing a clear error—did not.

AFFIRMED.