T.C. Memo. 1995-452

UNITED STATES TAX COURT

SPYGLASS PARTNERS, RICHARD E. SHEA, TAX MATTERS PARTNER, ET AL.,[1]
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 22789-93, 22790-93,     Filed September 25, 1995.
                22791-93.


<u>J. Gordon Hansen</u>, <u>John B. Wilson</u>, and <u>Scott R. Carpenter</u>,

for petitioners.

<u>Richard W. Kennedy</u>, for respondent.

<hr>

[1]These related partnership cases have been consolidated
herewith for purposes of trial, briefing, and opinion:  Pebble
Beach Partners, John J. Gleason, Tax Matters Partner, docket No.
22790-93; and Cypress Point Partners, John J. Gleason, Tax
Matters Partner, docket No. 22791-93.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent issued a notice of final partnership administrative adjustments to each of the three partnerships involved in these consolidated cases, determining adjustments for the 1984 and 1985 taxable years.  After concessions by the parties, the sole issue for consideration is whether any of the partnerships purchased condominiums in December 1983 for purposes of determining whether deductions may be taken, under section 483,[2] for unstated interest.[3]

### FINDINGS OF FACT[4]

David G. Derrick (Derrick), along with 11 other persons, orally agreed, during December of 1983, to form three Utah general partnerships:  Spyglass Partners, Pebble Beach Partners, and Cypress Point Partners.  The principal place of business of each partnership at all relevant times was in Utah.  Written or formal partnership agreements were not drawn or executed until

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to this Court's Rules of Practice and Procedure.

[3]The parties have agreed that the resolution of the factual issue concerning when the purchase of the condominiums occurred, which will be determinative of whether sec. 483 applies, will also be determinative of some of the "settled" issues.

[4]The parties' stipulation of facts and exhibits are incorporated by this reference.  Respondent agreed that the condominium purchases were actually consummated and were not sham transactions.  Respondent did not agree, however, that the condominiums were purchased prior to July 1984.

June 1984. Derrick was the managing general partner of each partnership. The primary business purpose of each partnership was to acquire and hold for rental and resale, existing condominium units located in property developments near the Park City, Utah, ski resort area.

During December 1983, Derrick made a $10,000 capital contribution and a $220,000 loan to each of the three partnerships. At the end of December 1983, Derrick, on behalf of each partnership, drafted and executed informal purchase agreements (December agreements) to acquire condominium units. Each partnership was to purchase 7 condominium units in 1 development and 16 condominium units in another, for a total of 69 units. The December agreements required a $10,000 downpayment per condominium unit ($690,000 total), with the balances to be paid in two installments: One on July 2, 1984, and another on either December 27 or 30, 2013. The aggregate installment obligations of the partnerships are as follows:

| | 16 Condominium Units | | 7 Condominium Units | |
| Partnership | July 2, 1984 | Dec. 27, 2013 | July 2, 1984 | Dec. 30, 2013 |
|---|---|---|---|---|
| Pebble Beach | $3,699,539 | $11,602,773 | $1,570,808 | $4,362,378 |
| Cypress Point | 3,763,989 | 11,796,111 | 1,505,538 | 4,189,221 |
| Spyglass | 3,688,132 | 11,568,533 | 1,582,378 | 4,393,074 |

As an example, a single condominium unit had a $658,655 selling price, a $154,284 first installment due July 2, 1984, and a $494,371 second installment due December 27, 2013.

The December agreements, in addition to setting forth the payment terms, required the sellers to place in escrow the deeds

that were to be recorded at the time the July 2, 1984, installment was paid. The sellers also agreed to subordinate the December 2013 installment payments to any permanent financing obtained by the partnerships. The December agreements also recited that "All of the burdens and benefits of ownership of the subject property are transferred from * * * [seller] to * * * [the purchasing partnership]" and "This document, may at the mutual consent of * * * [the parties], be superseded by a more formal contract of sale, as long as said contract does not change the terms and conditions outlined herein."

On or about December 30, 1983, the partnerships and condominium sellers executed 69 separate informal memoranda of condominium purchase agreements (December memoranda). The memoranda referenced the December agreements and had descriptions of the specific condominium units under contract attached to them. They also required the parties to cooperate in recording any documents necessary to evidence any termination of the December agreements. The December memoranda were recorded with the local county's recorder's office.

The seller of 3 groups of 16 condominium units (or a total of 48 units) had entered into purchase agreements during November 1983, after the builder's initial default on its construction mortgage with Western Savings and Loan Co. (Western Savings). The seller of 3 groups of 7 condominium units (or a total of 21 units) purchased the units from the builder during the last few

days of 1983, at a time when the loans due Western Savings were in default.

Prior to January 1, 1984, Derrick paid the escrow agent, Western States Title Co., $690,000. The $690,000 was the sum of Derrick's $10,000 capital contribution, and $220,000 loan, to each of the three partnerships ($30,000 plus $660,000). In early 1984, Derrick notified the condominium management company of the partnerships' ownership. During January 1984, the partnerships caused an insurance agency to inspect the condominiums in connection with the purchase of liability and casualty insurance. An insurance binder was executed on January 17, 1984. From the time of the December 1983 agreements, Derrick was generally responsible for overseeing the management companies, which collected rents, advertised for rentals, paid expenses, and handled the day-to-day condominium operations. Derrick also was involved in the repair and maintenance of some of the condominiums, including water leaks.

By letters dated February 15, 1984, Western Savings acknowledged the partnerships' inquiry about financing 48-unit and 21-unit groups of condominiums with loans, in the aggregate, of up to $10,700,000 and $3,939,000, respectively. Western Savings had been the lender to prior condominium owners. During April 1984, the partnerships opened bank accounts, yet the accounts had limited activity during April and May 1984. The activity did involve the receipt of rental income from

condominiums and the return of that income in accordance with a request from Western Savings' legal counsel.  On approximately June 15, 1984, Derrick and other individuals formed SK Management Co. (SK) to manage the condominiums, and, by letter dated June 15, 1984, the prior management company acknowledged receipt of the letter and agreed that SK would take over the condominium management.  The partnerships also engaged an accountant to review the records of the former management company, and, in September 1984, the accountant provided some financial data regarding the period of operations from December 27, 1983, through May 31, 1984.

During May and June 1984, the partnerships and sellers entered into separate identical, formal agreements or contracts (May agreements) for the sale of each condominium.  These superseding agreements did not change the basic obligations of the December agreement. The May agreements merely provided additional detail with which to carry out the intent of the December agreements.  The May agreements, although executed in May or June 1984, were dated as of the December 1983 date which corresponded to the December agreements. The May agreements provided for the same July 2, 1984, settlement date, and, in accordance with the December agreements, recited that the partnerships were entitled to possession of the condominiums, as well as all of the benefits and burdens of ownership.

The following documents were attached to the May agreements: (1) A recourse promissory note for the July 2, 1984, installment; (2) a recourse promissory note for the December 2013 installment; (3) a $50,000 judgment note for each condominium providing for enforcement by the sellers if the partnerships defaulted on payment of the July 2, 1984, installment; (4) a deed of trust encumbering each condominium as security for payment of the two installment notes; (5) a special warranty deed for each condominium; and (6) a quitclaim deed for each condominium. Western States Title Co. was to hold and record the deeds and close the escrow upon payment of the July 2, 1984, installment.

In the event of a presettlement default by the partnerships, the agreement provided each seller with two remedies. First, the seller would be relieved from all obligations in law and equity, including conveying title, and the buyer would become a tenant at will. In addition, the quitclaim deeds executed by the buyer would be recorded by the escrow agent, and payments made by the buyer would be retained by the seller as liquidated damages along with the judgment note. Second, the seller could declare the installment notes due, tender title to the buyer, and foreclose under the laws of the State of Utah. In the event of the seller's presettlement default, the buyer's sole remedy was to terminate and rescind the agreement; and the seller was to return all sums paid by the buyer to date along with 6-percent interest, at which time the escrow agent would record the buyer's quitclaim

deeds, and the seller and buyer would have no further obligations to each other.

On or about June 5, 1984, all partners, other than Derrick, contributed funds to the partnerships as initial capital contributions. At about the same time (early June 1984), the partners executed written, formal partnership agreements, which stated that they were "effective as of December 15, 1983." Subsequently in June 1984, each partnership admitted additional partners by means of capital contributions and execution of the latest written agreements. In 1984, the partnerships elected an interim closing of their books on the basis that the condominium sales occurred in December 1983, in order to allocate profit and loss between the original and new partners.

Each partnership timely paid the July 2, 1984, installment to the seller, and the escrow agent recorded documents in accordance with the written agreements. The source of the July 2, 1984, installment payments, for each partnership, was approximately $1 million from capital contributions and approximately $4,200,000 attributable to nonrecourse loans from Western Savings. The loans were amortized on a 30-year schedule subject to an 8-year call, and included shared appreciation provisions for the lender. Legal title to the condominiums did not pass to the partnerships until on or after July 2, 1984.

During November 1984, Derrick represented the partnerships before the condominium owners association, and financial

statements for January 1 through September 30, 1984, were reviewed. The financial statements reflected that the partnerships were being allocated income and expenses from the subject condominiums beginning on January 1, 1984.

The partnerships' 1984 Federal income tax returns reported interest deductions under section 483. The parties agree that, if petitioners are successful, the method used by the partnerships to report the interest deductions was correct. If, however, respondent is successful, the method for reporting the partnerships' interest deductions should have been in accordance with section 1.446-2, Proposed Income Tax Regs., 51 Fed. Reg. 12031 (Apr. 8, 1986).

Midway through 1985, the partnerships defaulted on the debt obligations to Western Savings. During September 1985 the partnerships voluntarily transferred the condominium units to a third party, subject to the installment obligation due Western Savings in 2013. The note underlying that installment was to be subordinated to any promissory note or lien securing the loan taken out to pay the first installment. The partnerships' 1985 Federal tax returns reflected losses from the disposition of the condominiums.

The fair market value of each condominium, as of December 1983, was equal to the downpayment plus the present value of the purchase price installments (determined pursuant to section 1.483-1(g)(1), Income Tax Regs.).

OPINION

The parties agree about the substance and requirements of section 483. Their sole disagreement is whether the first installments (the July 2, 1984, installments) were due more than 6 months after the date of sale pursuant to a contract containing unstated interest and requiring payments more than 1 year after the sale. In essence, the question is whether, in each instance, a sale occurred during December 1983. If the sales occurred in December 1983, petitioners will be successful; if the sales occurred later (less than 6 months before the first installment), respondent prevails, and petitioners are not entitled to deduct interest under section 483.[5]

In <u>Williams v. Commissioner</u>, T.C. Memo. 1992-269, affd.

---

[5]For the period under consideration, sec. 483(a) treated as interest an amount determined by means of a statutory formula and applied to the principal payments on a pro rata basis. See sec. 1.483-1(a)(1), Income Tax Regs. Amounts so allocated (as imputed interest) were deductible by a cash basis taxpayer in the year in which payment was made. If the taxpayer was on the accrual method of accounting for tax purposes, then the deduction was to be claimed in the year in which the payment became due. Sec. 1.483-2(a)(1)(ii), Income Tax Regs. Interest imputed under sec. 483 was treated as interest "for all purposes of the Code." Sec. 1.483-2(a)(1)(i), Income Tax Regs. Sec. 483, with certain exceptions set forth in sec. 483(d), applies

> to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract * * * under which some or all of the payments are due more than 1 year after the date of such sale or exchange * * * [Sec. 483(c).]

1 F.3d 502 (7th Cir. 1993), and <u>Lang v. Commissioner</u>, T.C. Memo. 1993-474, this Court analyzed similar condominium transactions and found that section 483 did not apply because the time between the sale date and the first installment was less than 6 months. Under the facts in those cases it was found that the initial agreement, although entered into more than 6 months before the first installment, constituted an option and not a sale.

In <u>Benedict v. United States</u>, 881 F. Supp. 1532 (D. Utah 1995), the U.S. District Court for the District of Utah also analyzed a similar condominium transaction and found that section 483 did apply because the time between the sale and first installment was more than 6 months. In that case, the court found that the buyer acquired an equitable interest, and that the benefits and burdens of ownership passed to the buyer upon execution of the initial informal agreement. Factual differences exist between prior Tax Court cases and the <u>Benedict</u> case. Moreover, the consolidated cases now before this Court have significant factual differences from all of the above-cited cases.

In their consideration of when the sale occurred, the courts characterized their task as a factual one.[6] In reaching their ultimate factual findings, the courts were guided by Utah law.

---

[6]The U.S. Court of Appeals for the Seventh Circuit expressed the view that the case presented a mixed question of fact and law, but there was no disagreement about the standard being followed. <u>Williams v. Commissioner</u>, 1 F.3d 502, 505 (7th Cir. 1993), affg. T.C. Memo. 1992-269.

The prior court opinions, although helpful to our analysis, do not control the outcome of the factual questions presented in the cases under consideration.

Respondent contends that petitioners' cases are no different from those already decided by this Court and, in one instance, approved by a Court of Appeals. Petitioners contend that these cases are factually distinguishable from Williams v. Commissioner, supra, and Lang v. Commissioner, supra, and petitioners assert that the rationale of Benedict v. United States, supra, should be followed. Because we are faced with a factual question, we first look to the record in these cases. Thereafter, we can compare the facts herein to those of the other cases.

Petitioners bear the burden of showing that they were entitled to the deductions in question. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). To be successful, petitioners must show that a sale was completed during December 1983. In a Federal tax proceeding, the question of when a sale is completed is to be resolved by the facts and circumstances in each case, and no one factor is controlling. Baird v. Commissioner, 68 T.C. 115, 124 (1977); Clodfelter v. Commissioner, 426 F.2d 1391 (9th Cir. 1970), affg. 48 T.C. 694 (1967). Concerning real property, a sale generally is completed at the earlier of the transfer of legal title or the practical assumption of the benefits and burdens of ownership. Baird v.

- 13 -

Commissioner, supra at 124; Dettmers v. Commissioner, 430 F.2d
1019 (6th Cir. 1970), affg. Estate of Johnston v. Commissioner,
51 T.C. 290 (1968).  Our factual inquiry must focus on the shift
of the benefits and burdens of ownership.  Baird v. Commissioner,
supra at 124; Merrill v. Commissioner; 40 T.C. 66 (1963), affd.
per curiam 336 F.2d 771 (9th Cir. 1964).  In a Federal tax
controversy, State law controls the determination of the
taxpayer's interest in the property, and the tax consequences are
then determined under Federal law.  United States v. National
Bank of Commerce, 472 U.S. 713, 722 (1985) (and cases cited and
quoted therein).

Unquestionably, petitioners did not acquire legal title
until July 2, 1984.  Accordingly, we must consider whether the
partnerships acquired equitable interests (i.e., the benefits and
burdens of ownership) prior to 1984.  Our decisions in Williams
and Lang, and the District Court's decision in Benedict, used the
factors outlined in Grodt & McKay Realty, Inc. v. Commissioner,
77 T.C. 1221, 1237-1238 (1981) (where it was decided whether a
sale of cattle had occurred).  We use the same factors here.

Legal Title.  As in prior cases, legal title did not pass
until the closing or settlement, which was the date of the first
installment.  As noted in other opinions, the lack of legal title
is not fatal to the completion of a sale of real property.  For
example, in Baird v. Commissioner, supra at 126, it was held that

the taxpayer became the equitable owner of realty under Utah State law, although legal title had not passed.

Intent of the Parties to the Transaction.[7] First, we find it significant that petitioners and respondent agreed that the condominium transactions under consideration are not shams. The authenticity of the documents used by the parties is not questioned. Respondent does not question that the parties intended that ownership of the condominiums was to pass. Respondent, however, argues that the 1983 agreements did not rise to the level of committing the parties to buy or sell the condominiums. Respondent contends that, in substance, the December 1983 agreements were nothing more than options to purchase condominiums. Accordingly, respondent's approach is one of substance over form with respect to the December 1983 documents. Respondent acknowledges factual differences between Williams and these cases, yet contends that the net result should be the same.

Although the informal documents reflect the intention of the parties to form partnerships and to transfer ownership of the condominiums to the partnerships, respondent argues that there is a lack of monetary commitment sufficient to support the form of the December agreements. Respondent notes that, initially, all capital contributions were attributable to Derrick. In the same

---

[7]Under Utah case law, when interpreting a contract, the parties' intentions are generally controlling. See, e.g., Winegar v. Froerer Corp., 813 P.2d 104, 108 (Utah 1991).

vein, respondent notes that the amount of capital and loans contributed by Derrick to each partnership ($10,000 and $220,000), although placed in escrow, was de minimis when compared to the purchase price set forth in the agreements.  In other words, respondent contends that both the partnerships and sales agreements were underfunded.

This lack of funding leads to respondent's additional contention that the partnerships and sales agreements were without substance until later documents were drafted and executed and the first installment payments were made.  Respondent accepts that the informal agreements express the parties' intent to agree to buy and sell the condominiums.  However, respondent contends that the sale did not take place in December of 1983.

Finally, respondent suggests that certain language in the December agreements indicates their conditional nature.  For example, respondent refers to the following language:  "In the event Seller or Buyer, as the case may be, elects to terminate the Agreement in accordance with the terms thereof, Seller and Buyer shall cooperate in executing and recording any and all documents necessary to evidence the termination of the Agreement".  We find that respondent's reliance upon this language is misplaced.  The referenced language does not establish that any party could unilaterally escape from its obligations.

We find that it was the parties' express intent to effect the sale of the condominiums by means of the December agreements. Albeit informal, those agreements were not conditional in their terms or voidable at will. The question remains, however, whether the parties effected their intent so that the partnerships could be considered equitable owners of the property as of December 1983.

Equity in the Condominiums. Each partnership paid $10,000 down for each condominium, for a total of $230,000 for 23 units per partnership. This $230,000 was preliminary to first installments totaling about $5,200,000 due just over 6 months later and second installments of about $16 million due in 30 years. As pointed out by respondent, there is great disparity between the downpayment and the first and/or second installments. A relatively small downpayment, however, does not require our finding that the $10,000 was not a payment towards equity in the designated condominiums. The language of the December agreements was specific as to the intention of the parties to effect the sale and the transfer of the benefits and burdens of ownership. Those agreements were without conditions. The term "option" is not used, and the parties were not provided a choice as to whether they wished to buy or sell. Respondent, however, argues that the small amount designated as a downpayment, coupled with the parties' ability to walk away from the transaction (including the return of the $10,000 in case of default or termination)

renders the terms of the December agreements options rather than sales contracts.

Utah courts have held that "an option contract for real property requires one offer and acceptance of the exclusive right to purchase the property and another offer and acceptance for the actual transfer of the property." Property Assistance Corp. v. Roberts, 768 P.2d 976, 978 (Utah Ct. App. 1989). More particularly, "Two elements exist in * * * [an option] contract: (1) an offer to sell, which does not become a contract until accepted; and (2) a contract to leave the offer open for a specified time." Id. The December agreements were not, in form, options. A second contract, in addition to the December agreements, was not necessary to effect the July 2, 1984, closing.

Respondent argues that the parties could walk away from the transaction with little or no monetary loss. In that regard, the agreements, as revised by the May agreements, provided specific remedies in the event of presettlement default. If the partnerships defaulted, the sellers had a choice of two remedies. First, each seller would be relieved from all obligations in law and equity to convey title to the buyer, and the buyer would become a tenant at will. All deeds executed by the buyer would be recorded by the escrow agent, and the $10,000 payment made by the buyer would be retained by the seller as liquidated damages along with the $50,000 judgment note for each condominium unit.

Alternatively, the seller could declare the installment notes due, tender title to the buyer, and foreclose under the laws of the State of Utah.  If the seller defaulted, the buyer's sole remedy was to terminate and rescind the agreement, whereupon the seller was to return all sums paid to the buyer, along with 6-percent interest.  Under those circumstances, the escrow agent was required to record the quitclaim deed from the buyer to the seller, leaving the buyer and seller with no further obligations to each other.

We are unable to find the substance of the agreements between the parties here to be options solely because of the size of the downpayment in relationship to the agreed-upon purchase price.  The circumstances here are not equivalent to the parties' having the option to walk away.  The buyers (partnerships) would be subject to a penalty if the first installment was not made.  That is so because the seller had the choice of accepting liquidated damages ($10,000 downpayment plus $50,000 per unit) or declaring the installment notes due and then foreclosing.  In that regard, the $60,000 damages approach 40 percent of the first installment.  Although the damages represent a smaller percentage of the second installment, that installment must be converted to a present value.  Such conversion would cause the damages to be relevant and proportionate to both installments.

One can argue that the sellers were able to walk away from the bargained-for price.  That argument, however, is wholly

dependent on whether the agreed-upon price was fair and amounted to valuable consideration.  The facts reflect that the agreed-upon price was not illusory.  Furthermore, the agreement did result in the payment of the first installment and the passage of legal title.  Therefore we conclude that the downpayments were true equity in the condominiums.  Additionally, in order to find that the December agreements were options under Utah law, we would have to find that the May agreements were separate contracts of sale.  The record does not support that finding, and there is nothing conditional about the December agreements or the parties' actions.

Present Obligation.  We must consider whether the partnerships were subject to enforceable obligations to purchase real estate under Utah law.  United States v. National Bank of Commerce, 472 U.S. 713 (1985); Major Realty Corp. v. Commissioner, 749 F.2d 1483, 1486 (11th Cir. 1985), affg. in part and revg. in part T.C. Memo. 1981-361.

Petitioners contend that a Utah realty purchase agreement is enforceable if it contains the essential terms of the parties' understanding and meets the requirements of the statute of frauds.  To meet the "essential terms" requirement, petitioners list four specific requirements, to wit, "the agreement must (1) designate the parties; (2) describe the property; (3) state the purchase price; and (4) contain any additional essential terms.  Reed v. Alvey, 610 P.2d 1374, 1378 (Utah 1980); Ferris v.

*Jennings*, 595 P.2d 857, 859 (Utah 1979)".  Finally, petitioners

point out that a property is sufficiently described if it cannot

be confused with other property.  *In re Estate of Bonny*, 600 P.2d

548, 549 (Utah 1979).

Respondent, does not dispute petitioners' contention that,

in form, the agreements may be enforceable under State law.

However, respondent counters that, under Federal law, we must

look at all of the facts and circumstances to reach a conclusion

as to whether there was a sale.  Respondent contends that, if

enforceable, the December agreements did not constitute sales but

were instead mere options to purchase or sell the condominiums.

Respondent relies on the discussion in *Williams v. Commissioner*,

T.C. Memo. 1992-269, to support her contention that the December

agreements were merely options.

In the *Williams* opinion, based on that record, it was found

that

> The meager penalty (restitution plus the payment of
> apparently below-market-rate interest) is inconsistent
> with any practical obligation on the part of the Seller
> and, in substance, supports the conclusion that the
> Seller had no more than an option to sell the
> Condominium, which it, of course, might decline to
> exercise.  * * * [Fn. ref. omitted.]

That element, coupled with the fact that, in *Williams*, some of

the condominiums had not yet been completed, provided the

rationale for the conclusion that the contracts, although

expressed as a sale in form, were in substance options to sell.

The U.S. Court of Appeals for the Seventh Circuit, although

affirming our decision in <u>Williams</u>, pointed out that the seller was committed because of the escrow of the deed and that the option was in the buyer, rather than the seller. <u>Williams v. Commissioner</u>, 1 F.3d at 506-507. One factor underlying the Court of Appeals' reasoning was the fact that the condominium in question was unfinished. Ultimately, however, the court was swayed by the fact that specific performance was waived and the buyer would forfeit only $60,000 if the option was not exercised. <u>Id.</u> at 507. Once again, because of the relative size of the amount forfeited to the amount that would have to be paid at closing, the Court of Appeals characterized the transaction as being a sale of a call for $60,000. <u>Id.</u>

The underlying question of whether the partnerships had any enforceable obligations is one we must decide under Utah law. We find that the December agreements were enforceable obligations with respect to the parties. This, of course, is a major factor to be considered in our ultimate analysis of whether, for Federal tax purposes, there had been a sale during December 1983 within the meaning of section 483.

<u>Right to Possession</u>. Concerning this aspect, the <u>Williams</u> and <u>Lang</u> opinions focused on the fact that the condominiums were unfinished. The condominiums here were complete at the time of the December agreements. Furthermore, the condominium management companies were notified in early 1984 of the partnerships' ownership. During January 1984, the partnerships caused an

insurance agency to inspect the condominiums in connection with the purchase of liability and casualty insurance, and an insurance binder was executed.  Finally, from the time of the December 1983 agreements, Derrick was generally the overseer of the management companies that collected rents, advertised for rentals, paid expenses, and handled the day-to-day condominium operations.  Possession of the condominiums by the partnerships or buyers was possible, and it was exercised by and through a general partner, Derrick.

Payment of the Property Tax.  There was no reference to real property tax in the December 1983 agreements.  In the May 1984 agreements (executed in May 1984, which related back to the December 1983 agreements), the real property taxes were to be prorated between the buyers and sellers as of the December 1983 execution date.  On this point, respondent argues that the May 1984 agreements may be the documents which created sufficient enforceable obligations to constitute a sale, rather than an option, for Federal tax purposes.[8]  Petitioners, however, counter that the May 1984 documents were drafted solely to modify the December 1983 agreements.  In that regard, petitioners contend that the December 1983 agreements constituted a completed sale and that the May 1984 documents simply added details to carrying

[8]Respondent argued that the sale may have occurred either at the time of executing the May 1984 agreements or at the time of the subsequent closing or settlement date, but that in either event petitioners would not have met the 6-month threshold of sec. 483.

out the express intent of the earlier and more informal documents.

Initially, we do not consider the real estate tax proration to be a significant aspect. In the context of this case, petitioners are attempting to show, by a preponderance of the evidence, that the December agreements constituted a sale. In that context, adding the proration of real estate tax in a May 1984 addenda does not have much, if any, probative value in meeting that burden. Ultimately, however, the partnerships were obligated to pay a pro rata share of the real estate tax for a period beginning with the execution of the December 1983 agreements.

Risk of Loss. This aspect concerns the question of who would bear any loss to the condominiums after the execution of the December 1983 agreements. This question was not addressed in prior opinions because few, if any, improvements had been made in Williams, Lang, or Benedict. Here, however, the condominiums were in existence prior to any agreements, and, if they were damaged or dropped in value, someone would have to bear the loss.

Petitioners argue that, under Utah's doctrine of equitable conversion, the sales occurred in December 1983. Under that doctrine, at the time of the execution of a contract for the sale of realty, the buyer acquires equitable ownership and the seller's interest is reduced to "naked legal title". This merely serves as security for payment of the purchase price. See Butler

v. Wilkinson, 740 P.2d 1244, 1254-1256 (Utah 1987); Lach v. Deseret Bank, 746 P.2d 802 (Utah Ct. App. 1987). In the instant case, the deeds from the sellers to the buyers were held in escrow and were to be recorded on July 2, 1984, after the payment of the first installment.

Respondent does not dispute petitioners' equitable conversion position, yet, instead, continues to argue that the December 1983 agreements were options and not sales, so that the sellers would continue to bear the risk of loss. The question of risk of loss is, according to respondent, dependent upon the ultimate question of whether, for purposes of petitioners' Federal tax, the December 1983 agreements constitute sales or options. To some degree, respondent's position begs the question.

Petitioners' analysis of Utah law, on the question of equitable conversion, reveals that, once a contract for sale of realty becomes effective, the benefits and burdens of ownership accrue to the buyer as a matter of law. The form of the December 1983 agreements supports petitioners' equitable conversion argument. Moreover, as petitioners point out, the benefits and burdens of ownership have been accepted as ownership for Federal tax purposes. See, e.g., Baird v. Commissioner 68 T.C. 115 (1977); Lach v. Deseret Bank, supra. In addition, Utah courts have applied the doctrine of equitable conversion for sales and inheritance tax purposes. See In re Estate of Willson, 499 P.2d

1298 (Utah 1972); Allred v. Allred, 393 P.2d 791 (Utah 1964). Again, to reach an "option conclusion" here, we must accept respondent's contention that the amounts the partnerships stood to lose were de minimis in relation to the sale price. Petitioners have made a strong case that equitable conversion occurred at the time of the December 1983 agreements. Accordingly the partnerships (buyers), based on the form of the agreements, would bear any loss to the condominiums.

Profits. In the Williams opinion, the question of profits from the condominiums was handled summarily because the condominiums were unfinished and could not be rented. Here, the condominiums were finished and rented. The December 1983 agreements, however, do not specify whether the seller or buyer would be entitled to profits from the rental of the condominiums. The December agreements did state that the buyers would receive all the benefits and burdens of ownership. Here, again, the question turns on whether the sellers or buyers had those benefits and burdens of ownership. Accordingly, equitable conversion at the time of signing the December 1983 agreements would have a bearing on the issue. In addition, general partner Derrick advised the condominium management company, relatively soon after the execution of the December 1983 agreements, that the partnerships had become the owners of the realty. After the closing, accountings were made reflecting allocation of all

income and expenses (ostensibly profits) to the partnerships from the time the December 1983 agreements were executed.

Equitable Title.  Based on the record and the above analysis, it is apparent, that in form, the partnerships had acquired equitable interests in the condominiums, at the time of the December agreements.[9]  In the Williams opinion, it was acknowledged that the "buyers obtained at best some equitable, not legal, interest in the property at the time the [initial] purchase Agreement was executed".  Williams v. Commissioner, T.C. Memo. 1992-269.  That opinion goes on to find that the substance of the Williams transactions was an option, rather than a sale. The Court of Appeals then reasoned that "There was no vesting of 'equitable title' in any sense, because the contract excluded a suit for specific performance by the buyers."  Williams v. Commissioner, 1 F.3d at 506.

In the setting of these cases, the parties' December 1983 agreements must be considered as self-contained, permitting no changes from the informally outlined terms and conditions. However, the December 1983 agreements were susceptible of being "superseded by a more formal contract of sale" by the "mutual consent of * * * [the parties]".  The December 1983 date is the crucial date upon which a sale (i.e., transfer of the benefits and burdens) must have occurred to come within the section 483

---

[9]The parties (and prior opinions) have made no distinction between the concepts of equitable title and equitable interest. For purposes of this opinion, we treat the terms as synonymous.

interest provisions. The December agreements did not contain default provisions. The parties made the simple, but all-encompassing statement: "All of the burdens and benefits of ownership of the subject property are transferred from * * * [seller] to * * * [buyer] as of the date of this Agreement." Further, the sellers placed in escrow all deeds relating to the transfer of the property which were to be recorded by the escrow agent on the designated closing date of July 2, 1984.

Accordingly, at the time of the execution of the December agreements, the buyers had not waived the specific performance remedy. That waiver occurred in connection with the superseding May agreements in which a $50,000 liquidated damages note was executed and exchanged. The waiver of specific performance, along with the liquidated damages provisions, did change the partnerships' remedies. At the time of the change, however, the partnerships had exercised possession and control over the condominiums. Furthermore, financing had been arranged, and the closing was imminent (about 1 month distant). Under these circumstances, respondent contends that the substance of the transaction prior to the closing indicated an option. However, Utah law causes us to find that the transactions resulted in equitable title or interests in the partnerships (buyers) as of December 1983.

Substance Over Form. Having analyzed several factors, we have concluded that, under Utah law, the December agreements

conferred the burdens and benefits of ownership on the partnerships.  We now consider under Federal law whether, in substance, a sale occurred in 1983 .  Even though the form of a transaction may effect a particular result, a Federal court may find that, in substance, the transaction was something other than its form.  Gregory v. Helvering, 293 U.S. 465 (1935).

The December agreements, although brief, are unambiguous binding sales contracts under Utah law.  It is significant that the basic operative sale components of the December 1983 agreements and memoranda were not changed in the May 1984 agreements.  The cost, method of payment, time of payment, and other major operative terms and obligations remained the same. In all agreements, the parties recited that the benefits and burdens of ownership were in the partnerships or buyers as of December 1983.  In addition, unlike prior cases, the condominium units were completed and had been placed on the rental market prior to the parties' agreements.  Rents were being collected, condominium management was aware of the partnerships' ownership, and allocations of income and expenses were made from the time of the December agreements.

The May 1984 agreements made additions to the December agreements by including the $50,000 judgment notes, prorating real estate taxes, requiring title insurance, and providing for specific remedies in the case of default.  Accordingly, from the time of the December 1983 agreements until execution of the May

1984 agreements, the parties' remedies could have included seeking specific performance, damages, etc. After execution of the May 1984 agreements, the buyers could no longer bring suits for specific performance against the sellers. When the specific performance remedy was waived[10] and liquidated damages were added, the partnerships had already exercised possession and control over the condominiums, financing had been arranged, and the closing was about 1 month away. The deeds from the sellers to the partnerships were placed in escrow so that payment of the first installment would effectuate the recording of sellers' deeds and the transfer of legal titles to the partnerships. The partnerships were committed to and ultimately did pay the installments due on July 2, 1984. When specific performance was waived, matters had progressed to the point where the parties were prepared and ready to exchange cash for legal title in the amounts agreed upon in the December agreements.

In addition, the partnerships stood to lose $60,000 per condominium unit if the first installments were not made. As noted, the $60,000 represented about 40 percent of the first installment. Approaching the first installment (due in a little

---

[10]Petitioners contend that specific performance by the buyer would have been against the escrow agent who held the deeds. Petitioners argue that limiting the remedy between the parties to liquidated damages would not preclude the partnerships from seeking specific performance from the escrow agent. We are not persuaded by petitioners' argument; however, our analysis and the resolution of the issues here make it unnecessary to further pursue it.

over 1 month) the parties' understanding continued to be that the buyers were possessors/owners. Quitclaim deeds from the buyers to the sellers were held in escrow in order to convey the condominiums back to the sellers in case of the buyers' defaults. The purpose of the quitclaim deed was to permit the seller to regain unfettered title by eliminating the interest held by the partnerships (i.e. equitable interests). Accordingly, the buyers (partnerships) had possession, profits, and an equitable interest and had no need to seek specific performance. Although the sellers appear to have had the ability to escape if the market value of the condominiums exceeded the contract price, that aspect was of little import under the circumstances existing at the time the May agreements were executed and until the July 2, 1984, closing, just over 1 month later.

Prior opinions have reached the "option conclusion" mainly because of the relevant amounts at risk or the lack of a quantitatively relevant remedy. The factual differences here caused us to reach the ultimate finding that equitable title or the benefits and burdens of ownership of the condominiums resided in the partnerships as of December 1983 and were not divested by the terms of the May agreements. Under these circumstances, we cannot conclude that the size of the downpayment or liquidated damages should cause a finding that the December agreements were, in effect, options and not contracts for sale. Further, Utah law does not support an "option finding" with respect to the December

agreements here.  After considering all of the factors here, we find that the partnerships have shown that a sale occurred in December 1983, both in form and in substance.  Accordingly, petitioners have shown that they come within the section 483 requirements, and that they are entitled to the interest deductions.

To reflect the foregoing, and due to concessions of the parties,

Decisions will be entered

under Rule 155.